Richard W. Gonnello (admitted *pro hac vice*)
Katherine M. Lenahan (admitted *pro hac vice*)
Sherief Morsy (admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: rgonnello@faruqilaw.com
          klenahan@faruqilaw.com
          smorsy@faruqilaw.com

Benjamin Heikali SBN 307466
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
Email: bheikali@faruqilaw.com

*Attorneys for Lead Plaintiff David Sterrett*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DAVID STERRETT, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

          v.

SONIM TECHNOLOGIES, INC., ROBERT
PLASCHKE, JAMES WALKER, MAURICE
HOCHSCHILD, ALAN HOWE, KENNY
YOUNG, SUSAN G. SWENSON, JOHN
KNEUER, JEFFREY D. JOHNSON,
OPPENHEIMER & CO., INC., LAKE
STREET CAPITAL MARKETS, LLC, and
NATIONAL SECURITIES CORPORATION,

                    Defendants.

Case No. 3:19-cv-06416-MMC

**AMENDED CLASS ACTION
COMPLAINT**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

TABLE OF DEFINED TERMS AND ABBREVIATIONS ........................................................... ii

TABLE OF PERSONS AND ENTITIES ................................................................ iii

CHRONOLOGY ........................................................................................ iv

I.      NATURE OF THE ACTION ................................................................1

II.     JURISDICTION AND VENUE ...........................................................4

III.    THE PARTIES ...................................................................................5

    A.      Plaintiff ..................................................................................5

    B.      Defendants.............................................................................5

        1.      Sonim Technologies, Inc. ...........................................5

        2.      Individual Defendants ................................................5

        3.      Underwriter Defendants ..............................................6

IV.     SUBSTANTIVE ALLEGATIONS ......................................................7

    A.      Background Of Sonim And Its Mobile Phone Products ........7

    B.      Sonim Customers Complain Of Connectivity Issues ...........11

    C.      Sonim's IPO ..........................................................................12

    D.      False And/Or Misleading Statements In The Registration Statement.................13

    E.      Sonim Reveals XP8 Chipset Defect And XP3/XP5s Software Failure ...............19

V.      CLASS ACTION ALLEGATIONS.....................................................22

VI.     CLAIMS FOR RELIEF.......................................................................24

VII.    PRAYER FOR RELIEF.......................................................................26

VIII.   JURY TRIAL DEMAND.....................................................................27

**TABLE OF DEFINED TERMS AND ABBREVIATIONS**

| Term | Definition |
|---|---|
| **CEO** | Chief Executive Officer |
| **Class** | Persons or entities who purchased or otherwise acquired shares of Sonim common stock pursuant to and/or traceable to Sonim's May 9, 2019 initial public offering and Registration Statement, and who were damaged thereby, seeking remedies under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o, against Sonim, the IPO's underwriters, and certain of Sonim's current and former officers and directors |
| **CFO** | Chief Financial Officer |
| **FirstNet** | Built with AT&T, the United States' first and only communications platform dedicated to public safety, which was available to Sonim's phones |
| **IPO** | Sonim's May 9, 2019 initial public offering |
| **Prospectus** | Final prospectus filed with the SEC on May 13, 2019 |
| **Registration Statement** | Registration statement for Sonim's IPO filed with the SEC on April 15, 2019, as amended on April 29, 2019 and May 9, 2019, along with the Prospectus filed May 13, 2019 |
| **Securities Act** | Securities Act of 1933 |
| **Snapdragon** | Qualcomm's Snapdragon 630 OctaCore @ 2.2GHz 64 bit chipset, which was a central component of the XP8 |
| **XP3** | Sonim XP3 phone, launched April 2019 |
| **XP3/XP5s Software Failure** | Software defect where XP3 and XP5s phones were, *inter alia*, experiencing feedback issues when using accessories, which Sonim failed to test for |
| **XP5s** | Sonim XP5s phone, launched March 2018 |
| **XP8** | Sonim XP8 phone, launched March 2018 |
| **XP8 Chipset Defect** | Network connectivity issues which arose as a result of Sonim choosing to be the first to launch with Qualcomm's Snapdragon chipset in North America without adequate testing beforehand |

## TABLE OF PERSONS AND ENTITIES

| Name | Description |
|---|---|
| AT&T | Wireless carrier AT&T, Inc.—sold Sonim phones and accessories |
| Company | Defendant and issuer Sonim Technologies, Inc. |
| Hochschild | Defendant and Sonim director Maurice Hochschild |
| Howe | Defendant and Sonim director Alan Howe |
| Johnson | Defendant and Sonim director Jeffrey D. Johnson |
| Kneuer | Defendant and director John Kneuer |
| Lake Street | Defendant and IPO underwriter Lake Street Capital Markets, LLC |
| NSC | Defendant and IPO underwriter National Securities Corporation |
| Oppenheimer | Defendant and IPO underwriter Oppenheimer & Co. Inc. |
| Plaintiff | Lead Plaintiff David Sterrett |
| Plaschke | Defendant and Sonim's former CEO Robert Plaschke |
| Qualcomm | Non-party Qualcomm, Inc., supplier of Snapdragon chipset in XP8 phone |
| SEC | United States Securities and Exchange Commission |
| Sprint | Wireless carrier Sprint Corporation—sold Sonim phones and accessories |
| Sonim | Defendant and issuer Sonim Technologies, Inc. |
| Swenson | Defendant and Sonim's director Susan G. Swenson |
| Verizon | Wireless carrier Verizon Communications, Inc.—sold Sonim phones and accessories |
| Walker | Defendant and Sonim's former CFO James Walker |
| Young | Defendant and Sonim director Kenny Young |

**CHRONOLOGY**

| Date | Event |
|---|---|
| **Aug. 1999** | Sonim founded as a private company. ¶16. |
| **Mar. 2018** | Sonim launches the XP8 and XP5s phones. ¶¶35, 38.<br><br>The XP8 is equipped with the Snapdragon chipset, and is the first phone to launch in North America with that chipset, leading to the XP8 Chipset Defect and resulting in numerous customer complaints regarding the XP8 including about dropped calls. ¶¶37,41-42, 68. |
| **Mar. 2018 & Onward** | XP8 users experience connectivity issues as a result of XP8 Chipset Defect. ¶¶37, 42.<br><br>XP5s experiences Software Failure resulting in noise feedback when connected to accessories. ¶¶40, 68. |
| **Feb. 14, 2019** | Sonim files a draft registration statement with the SEC. ¶43. |
| **Apr. 2019** | Sonim launches the XP3. ¶39.<br><br>XP3 experiences Software Failure resulting in noise feedback when connected to accessories. ¶¶40, 68. |
| **April 1, 2019** | Sonim's second quarter of 2019 begins. ¶67.<br><br>Sonim begins experiencing lost sales momentum due to XP8 Chipset Defect and XP3/XP5s Software Failure. ¶¶66-67. |
| **Apr. 15, 2019** | Sonim files a registration statement on Form S-1 with the SEC. ¶43. |
| **Apr. 29, 2019** | Sonim files Amendment No. 1 To Form S-1 with the SEC, registering 4,107,143 shares at a proposed maximum offering price of $15.00 per share. ¶43. |
| **May 9, 2019** | Sonim files its final amendment to the registration statement on Form S-1/A with the SEC. ¶43.<br><br>SEC declares Sonim's registration statement effective. ¶43.<br><br>IPO begins. ¶43. |
| **May 10, 2019** | Sonim shares begin trading on the Nasdaq Global Market under the ticker symbol "SONM." ¶44. |
| **May 13, 2019** | Sonim files the Final Prospectus from the IPO, which forms part of the Registration Statement, and sells 3,571,429 shares of Sonim common stock to the investing public at $11 per share for net proceeds of approximately $36.5 million, excluding $2.75 million in discounts and commissions paid to the Underwriter Defendants ¶45. |

| **May 22, 2019** | Sonim sells an additional 505,714 registered Sonim shares and Plaschke sells an additional 30,000 registered Sonim shares at $11.00 per share pursuant to the exercise of the underwriters' option to purchase additional shares in the IPO.  ¶46. |
|---|---|
| **Sept. 10, 2019** | Sonim issues a press release revealing that it "***experienced technical challenges related to its XP8 smartphone and other general non-systemic, accessory-related issues in its feature phones, which cumulatively resulted in lost sales momentum***"; announcing update in fiscal guidance for year ending December 31, 2019 stating that net revenues are expected to be flat or slightly below 2018's net revenue of $135.7 million; and announcing CFO Walker's resignation.  ¶65.<br><br>Sonim holds a conference call with investors where Plaschke details the XP8 Chipset Defect and XP3/XP5s Software Failure.  ¶¶66-68. |
| **Oct. 7, 2019** | First lawsuit is filed against Sonim regarding the Registration Statement and IPO.  ¶¶10, 72.<br><br>Sonim shares close at $3.15 per share, well below the $11 IPO price.  ¶¶10, 72. |

The allegations in this Amended Securities Class Action Complaint ("**Complaint**") are based on the personal knowledge of Lead Plaintiff David Sterrett ("**Plaintiff**"), as to Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Plaintiff's information and belief is based upon the substantial investigation by Plaintiff's counsel into the facts and circumstances alleged herein, including the following: (i) a review and analysis of those public filings referenced herein that Sonim Technologies, Inc. ("**Sonim**" or the "**Company**") made with the United States Securities and Exchange Commission ("**SEC**"); (ii) a review and analysis of those press releases, analyst reports, public statements, news articles, and other publications referenced herein that were disseminated by or concern Sonim and/or the other defendants named herein; (iii) a review and analysis of those Company conference calls, press conferences, and related statements and materials referenced herein; and (iv) review and analysis of those other documents referenced herein.  The mere reference to documents herein does not automatically incorporate them by reference or otherwise render Plaintiff's claims based on these documents.  Many additional facts supporting the allegations are known only to the Defendants and/or are within their exclusive custody or control.  Plaintiff believes that additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this federal securities class action on behalf of a class (the "**Class**") consisting of persons or entities who purchased or otherwise acquired shares of Sonim common stock pursuant to and/or traceable to Sonim's May 9, 2019 initial public offering ("**IPO**") and Registration Statement (defined herein), and were damaged thereby, seeking remedies under Sections 11 and 15 of the Securities Act of 1933 ("**Securities Act**"), 15 U.S.C. §§ 77k and 77o, against Sonim, the IPO's underwriters, and certain of Sonim's current and former officers and directors.

2.    Sonim provides ultra-rugged mobile phones and accessories designed for workers physically engaged in their work environments, "often in mission-critical roles."  *See* Sonim, *About Sonim Technologies*, https://www.sonimtech.com/corporate/ (last visited Feb. 24,

1  2020).  Sonim sells its mobile phones and accessories through three of the four largest wireless

2  carriers in the United States—AT&T Inc. ("**AT&T**"), Sprint Corporation ("**Sprint**"), and

3  Verizon Communications Inc. ("**Verizon**")—and the three largest wireless carriers in Canada—

4  BCE Inc., Rogers Wireless Inc., and Telus Mobility.  Sonim refers to these carriers and other

5  distributors as its "channel partners."

6      3.      Sonim's main phone offerings include the following devices:  (1) the Sonim XP8

7  ("**XP8**"); (2) the Sonim XP5s ("**XP5s**"); and (3) the Sonim XP3 ("**XP3**").  Sonim touts that

8  these phones have access to **FirstNet**, "the country's first and only communications platform

9  dedicated to public safety."  The XP8 and XP5s were launched in March 2018, and the XP3 was

10  launched in April 2019.

11      4.      Seeking access to the public capital markets, on February 14, 2019, Sonim filed a

12  draft registration statement with the SEC.  *See* Sonim, *Draft Registration Statement*, *available*

13  *at* https://www.sec.gov/Archives/edgar/data/1178697/000095012319002285/filename1.htm

14  (filed Feb. 14, 2019).  On April 15, 2019, Sonim filed a registration statement on Form S-1 with

15  the SEC.  Sonim, Form S-1 Registration Statement (Apr. 15, 2019).  Then, on April 29, 2019,

16  Sonim filed Amendment No. 1 To Form S-1 with the SEC, registering 4,107,143 shares at a

17  proposed maximum offering price of $15.00 per share.  *See* Sonim, Form S-1/A (Apr. 29,

18  2019).  On May 9, 2019, Sonim filed the final amendment to the registration statement with the

19  SEC.  *See* Sonim, Form S-1/A (May 9, 2019).  On that same day, the SEC declared the

20  registration statement effective and Sonim conducted its IPO.  On May 13, 2019, Sonim filed

21  the final prospectus for the IPO pursuant to 17 C.F.R. § 240.424(b)(4) (the "**Prospectus**"),

22  which forms part of the registration statement (the Prospectus and registration statement—as

23  amended from time to time—are collectively referred to herein as the "**Registration**

24  **Statement**").

25      5.      As a result of the IPO, Sonim issued and sold 4,107,143 shares of Sonim stock at

26  $11 per share—3,571,429 on the date of the IPO and an additional 535,714 shares through the

27  underwriters' exercise of their right to purchase shares to cover over-allotments—raising $37.5

28  million in aggregate net proceeds, after excluding $3.1 million in discounts and commissions

paid to the Underwriter Defendants.

6.     Unbeknownst to investors, Sonim's Registration Statement misrepresented and omitted material facts concerning the functionality of Sonim's phone offerings and the impact of the limited functionality on Sonim's sales.

7.     First, the Registration Statement failed to disclose that the XP8 contained a design defect.  That is, customers were experiencing network connectivity issues as a result of Sonim's decision to effectively act as a "*beta customer*"—*i.e.*, a purchaser involved in *beta or trial testing* of a product, *see* LEXICO, *beta customer*, https://www.lexico.com/en/definition/beta_customer (last visited Feb. 24, 2020)—to Qualcomm, Inc. ("**Qualcomm**") by becoming the first company to launch a phone in North America with Qualcomm's Snapdragon 630 OctaCore @ 2.2GHz 64 bit chipset ("**Snapdragon**") as a component (the "**XP8 Chipset Defect**").  Sonim, *Sonim Technologies Inc To Discuss Business Update and Fiscal 2019 Financial Guidance Call*, at 7 (Sept. 10, 2019) (transcript available at FD (Fair Disclosure) Wire).  Generally, "[m]obile phones run on so-called embedded chipsets, which are designed to perform one or a few dedicated functions, often with real-time computing constraints . . . [and are] part of the complete device including hardware and mechanical parts."  GSMArena, *Chipset Definition*, https://www.gsmarena.com/glossary.php3?term=chipset (last visited Feb. 24, 2020).  Prior to the IPO, XP8 customers were lodging complaints with their cell phone carriers about connection issues with their XP8 phones, including complaints of the phones dropping calls and describing the phone as "not ready for release" and a "waste of money."  Had Sonim adequately tested the XP8, it would not have needed to "take a gamble" as it later admitted and could have resolved these issues before going public.

8.     The Registration Statement also failed to disclose that Sonim did not adequately test its phones in "mission critical," *i.e.*, real-world, environments, and as a result, the XP3 and XP5s were experiencing software defects resulting in noise feedback when connected to accessories (the "**XP3/XP5s Software Failure**").  Sonim, *Sonim Technologies Inc To Discuss Business Update and Fiscal 2019 Financial Guidance Call*, at 7 (Sept. 10, 2019) (transcript

available at FD (Fair Disclosure) Wire).  Sonim's then-Chief Executive Officer ("**CEO**") Robert Plaschke ("**Plaschke**") gave the following example of the issues caused by the XP3/XP5s Software Failure, "You have a school bus company who has a certain wiring configuration to the . . . holder where you put the phone in, and that wiring configuration as it turns out if it's not . . . *not optimized can create[] feedback that can affect the noise cancellation software on the phone*."

9.      Last, the Registration Statement failed to disclose that the XP8 Chipset Defect and XP3/XP5s Software Failure were *already causing Sonim to lose sales momentum at the time of the IPO*, as Plaschke eventually admitted that Sonim was experiencing lost sales momentum as early as the second quarter of 2019 which was before Sonim's IPO.  *Sonim Technologies Inc To Discuss Business Update and Fiscal 2019 Financial Guidance Call*, at 2 (Sept. 10, 2019) (transcript available at FD (Fair Disclosure) Wire)

10.      As of the filing of the first-filed action on October 7, 2019, *Malhotra v. Sonim Technologies, Inc., et al.*, No. 3:19-cv-06416-MMC, ECF No. 1, Sonim's stock price closed at $3.15 per share on that day—well below the $11 per share IPO price.

## II.      JURISDICTION AND VENUE

11.      This action arises under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

12.      This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331, and Section 22 of the Securities Act (15 U.S.C. § 77v).

13.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v).  Sonim maintains its principal place of business in this District.  Certain of the acts and conduct complained of herein, including dissemination of materially false and misleading Registration Statement to the investing public, occurred in this District.

14.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national

1 securities markets.

2 **III.    THE PARTIES**

3       **A.    Plaintiff**

4       15.    As evidenced in his certification, *see* ECF No. 16-3, Plaintiff David Sterrett

5 purchased Sonim stock pursuant and/or traceable to the Registration Statement and was

6 damaged thereby.

7       **B.    Defendants**

8           **1.    Sonim Technologies, Inc.**

9       16.    Sonim is a Delaware corporation with its principal executive offices located at

10 1875 South Grand Street, Suite 750, San Mateo, California, and was founded in or around

11 August 5, 1999.  Sonim's common stock trades on the Nasdaq Global Market under the ticker

12 symbol "SONM."

13           **2.    Individual Defendants**

14       17.    Robert Plaschke ("**Plaschke**") was Sonim's Chief Executive Officer ("**CEO**") at

15 the time of the IPO and until his resignation on October 29, 2019.  Plaschke signed the

16 Registration Statement, and directly participated in and controlled the management of the

17 Company, including the decision for Sonim to go public and the publication of the Registration

18 Statement.

19       18.    James Walker ("**Walker**") was Sonim's Chief Financial Officer ("**CFO**") until

20 his resignation on September 10, 2019.  Walker signed the Registration Statement, and directly

21 participated in and controlled the management of the Company, including the decision for

22 Sonim to go public and the publication of the Registration Statement.

23       19.    Maurice Hochschild ("**Hochschild**") was at all relevant times a Sonim director

24 and Chairman of the Company's board of directors.  Hochschild signed the Registration

25 Statement, and directly participated in and controlled the management of the Company,

26 including the decision for Sonim to go public and the publication of the Registration Statement.

27       20.    Alan Howe ("**Howe**") was at all relevant times a Sonim director.  Howe signed

28 the Registration Statement, and directly participated in and controlled the management of the

1  Company, including the decision for Sonim to go public and the publication of the Registration

2  Statement.

3      21.    Kenny Young ("**Young**") was at all relevant times a Sonim director.  Young

4  signed the Registration Statement, and directly participated in and controlled the management

5  of the Company, including the decision for Sonim to go public and the publication of the

6  Registration Statement.

7      22.    Susan G. Swenson ("**Swenson**") was at all relevant times a Sonim director.

8  Swenson signed the Registration Statement, and directly participated in and controlled the

9  management of the Company, including the decision for Sonim to go public and the publication

10 of the Registration Statement.

11     23.    John Kneuer ("**Kneuer**") was at all relevant times a Sonim director.  Kneuer

12 signed the Registration Statement, and directly participated in and controlled the management

13 of the Company, including the decision for Sonim to go public and the publication of the

14 Registration Statement.

15     24.    Jeffrey D. Johnson ("**Johnson**") was at all relevant times a Sonim director.

16 Johnson signed the Registration Statement, and directly participated in and controlled the

17 management of the Company, including the decision for Sonim to go public and the publication

18 of the Registration Statement.

19     25.    The defendants listed in this subsection are collectively referred to herein as the

20 "**Individual Defendants**."

21              **3.      Underwriter Defendants**

22     26.    Oppenheimer & Co. Inc. ("**Oppenheimer**") acted as an underwriter of Sonim's

23 IPO.  Oppenheimer is headquartered at 85 Broad Street, New York, NY 10004.

24     27.    Lake Street Capital Markets, LLC ("**Lake Street**") acted as an underwriter of

25 Sonim's IPO.  Lake Street is headquartered at 920 Second Avenue South, Suite 700,

26 Minneapolis, MN 55402.

27     28.    National Securities Corporation ("**NSC**") acted as an underwriter of Sonim's

28 IPO.  NSC is headquartered at 200 Vesey Street, 25th Floor, New York, NY 10281.

29.     The defendants listed in this subsection are collectively referred to herein as the "**Underwriter Defendants**."

30.     The Underwriter Defendants are investment banking houses which specialize in, *inter alia*, underwriting IPOs of securities.  They served as the underwriters of the IPO and shared more than $3.1 million in fees collectively.  The Underwriter Defendants determined that, in return for their share of the IPO proceeds, they were willing to offer and sell Sonim stock and solicit Sonim investors in the IPO.

31.     Representatives of the Underwriter Defendants also assisted Sonim and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Sonim, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Sonim's operations and financial prospects.

32.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background Of Sonim And Its Mobile Phone Products

33.     Sonim describes itself as a "leading U.S. provider of ultra-rugged mobility solutions designed specifically for task workers physically engaged in their work environments, often in mission-critical roles."  Sonim, *About Sonim Technologies*, https://www.sonimtech.com/corporate/ (last visited Feb. 24, 2020).  Specifically, Sonim specializes "in workforce-critical communication and connectivity tools for industrial enterprises and public sector agencies including end customers in construction, energy and utility, hospitality, logistics, manufacturing, public safety and transportation."  *Id.*  Sonim offers the following three categories of products:  (1) ultra-rugged mobile devices, (2) industrial-grade accessories and (3) cloud-based software and application services.  *Id.*

1

34.     At the time of Sonim's IPO, Sonim marketed the following three mobile devices:

2   (1) the XP8; (2) the XP5s; and (3) the XP3.  *Id.*  The Company asserted that the XP8 and XP5s

3   were the primary drivers of Sonim's revenue for the years ending December 31, 2017 and

4   December 31, 2018.  *See* Registration Statement at 59.  The XP3 was Sonim's latest feature

5   phone at the time of the IPO.  *See* Registration Statement at 53.

6

35.     The XP8 launched in March 2018, with Sonim touting that it (along with the

7   XP5s) was available to first responders on FirstNet, the country's first and only communications

8   platform dedicated to public safety.  *See* Press Release, *Sonim Announces Two New Ultra-*

9   *Rugged Devices Coming To FirstNet* (Mar. 1, 2018).  FirstNet, built with AT&T, "is the first

10  communications platform to announce support for [the XP8 and XP5s][.]"  *Id.*  Sonim claimed

11  that "[f]irst responder subscribers can use the XP8 or XP5s to unleash the full power of

12  FirstNet, accessing critical capabilities like First Priority™.  This includes both priority and

13  preemption, giving first responders a reliable, highly secure and always-on connection to the

14  information they need.  Plus, both the XP8 and XP5s are integrated with the AT&T Enhanced

15  Push-to-Talk (EPTT) platform for FirstNet."  *Id.*

16

36.     The XP8 (depicted below) is an Android-based LTE smartphone with a five-inch

17  durable, glove-friendly display, an ultra-rugged exterior, and physical programmable buttons

18  (including a large Push-To-Talk button).  *See* Sonimtech.com, *Meet Sonim XP8, Specifications*,

19  https://www.sonimtech.com/xp8/#tab-b499109d342d8bf0698 (last visited Feb. 24, 2020).

20  Sonim markets the XP8 to "those who serve" and for "missions that demand much more than

21

22

23

24

25

26

27

28

**AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:19-cv-06416-MMC**

1  voice communication."



16      37.    At its launch, the XP8 was equipped with Qualcomm's Snapdragon chipset.  *See*

17  Sonimtech.com, *Meet Sonim XP8, Specifications*, https://www.sonimtech.com/xp8/#tab-

18  b499109d342d8bf0698 (last visited Feb. 24, 2020).  Unbeknownst to investors, by choosing to

19  be the first to launch the Snapdragon chipset in North America, the Company assumed the risk

20  of network-related issues and exposed XP8 customers to network-connectivity issues as a result

21  of the XP8 Chipset Defect, which was "inherent in [the XP8's] design[,]" *see Cobos v. Ray-*

22  *GoWagner, Inc.*, 15 F.3d 1083 (9th Cir. 1994), and which Sonim failed to adequately test for.

23      38.    The XP5s (depicted below) also launched in March 2018 to first responders and

24  was made available on FirstNet.  *See* Press Release, *Sonim Announces Two New Ultra-Rugged*

25  *Devices Coming To FirstNet* (Mar. 1, 2018).  The XP5s is a purpose-built LTE feature phone

26  designed for task workers and comes equipped with a 2.64-inch non-touch display, dual front-

27  facing loudspeakers, and a large Push-To-Talk button.  The XP5s is also marketed to "meet the

28  needs of those who serve[,]" and is purportedly "built to survive the most extreme environments

9

1   on earth[.]"  Sonimtech.com*, Introducing the Sonim XP5s*,

2   https://www.sonimtech.com/products/devices/xp5s/ (last visited Feb. 24, 2020).



16      39.      In April 2019, shortly before the IPO, Sonim launched the XP3(depicted below).

17   The XP3 is an LTE feature phone in a clamshell (or flip phone) form.  The XP3 is marketed to

18   those "[i]n extreme working environments[.]"  Sonimtech.com, *Introducing Sonim XP3*,

19   https://www.sonimtech.com/products/devices/xp3/ (last visited Feb. 24, 2020).

10

1
2
3
4
5
6
7
8
9
10
11
12
13



14   40.   Unbeknownst to investors, Sonim **did not test** the XP5s and XP3 in "mission

15   critical" environments, and as a result the XP5s and XP3 were subject to the XP3/XP5s

16   Software Failure resulting in audio feedback problems when the phones were connected to

17   accessories.  Sonim, *Sonim Technologies Inc To Discuss Business Update and Fiscal 2019*

18   *Financial Guidance Call*, at 7 (Sept. 10, 2019) (transcript available at FD (Fair Disclosure)

19   Wire).

20        **B.    Sonim Customers Complain Of Connectivity Issues**

21   41.   As Sonim later revealed after its IPO, by electing to be an early adopter of the

22   Snapdragon chipset, the Company exposed XP8 customers to "network-related issues."  Sonim,

23   *Sonim Technologies Inc To Discuss Business Update and Fiscal 2019 Financial Guidance Call*,

24   at 7 (Sept. 10, 2019) (transcript available at FD (Fair Disclosure) Wire).  Indeed, ***prior to the***

25   ***IPO***, XP8 users were already lodging a litany of complaints about their XP8 phones.

26   42.   For example, on AT&T's customer review website, one customer complained

27   that the XP8 "***randomly drops calls[.]***"  Another complained that the "***phone would constantly***

28   ***put [itself] into airplane mode or disable cellular data and you wouldn't have service***."  And

yet another customer complained, "***This phone was not ready for release. . . . [The phone] turn[s] off cellular dat[a], and more.  I wish I never bought this phone***."  AT&T's and Sprint's customers also raised the following complaints:

- "I've had it for a couple of weeks now and am seriously regretting this purchase.  ***No wifi calling, terrible camera, picture/video messages won't open, there is a delay in the keyboard. . . . Waste of money***."

- "***Nobody should ever buy this phone! It is the most utter piece of garbage ever.*** I have had it since November 2019 and it is always freezing up on me and the camera sucks."

- "***Constantly dropping calls***, shutting down, very difficult to maneuver from on[e] thing to the next.  It came with VERY little instructions and ***we hate it***."

- "***Talk/Text does not function over internet in some cases***."

- "My husband just got a Sonim XP8.  He doesn't like it.  ***It has dropped calls 3 out of 5 times***, phone constantly shuts down when on an app, ***doesn't have great reception***.  He does not want it. How can I go about turning this phone in and obtaining another brand?"

### C.    Sonim's IPO

43.    On February 14, 2019, Sonim filed a draft registration statement with the SEC. *See* Sonim, *Draft Registration Statement*, *available at* https://www.sec.gov/Archives/edgar/data/1178697/000095012319002285/filename1.htm (filed Feb. 14, 2019).  On April 15, 2019, Sonim filed a registration statement on Form S-1 with the SEC.  Sonim, Form S-1 Registration Statement (Apr. 15, 2019).  Then, on April 29, 2019, Sonim filed Amendment No. 1 to the registration statement on Form S-1/A with the SEC, registering 4,107,143 shares at a proposed maximum offering price of $15.00 per share.  *See* Sonim, Form S-1/A (Apr. 29, 2019).  On May 9, 2019, Sonim filed the final amendment to the registration statement on Form S-1/A with the SEC.  *See* Sonim, Form S-1/A (May 9, 2019). On that same day, the SEC declared the registration statement effective.  Additionally, on that same day, Sonim announced the pricing of its initial public offering, issuing 3,571,429 shares of

common stock at a price to the public of $11.00 per share, as well as a 30-day option granted to underwriters to purchase up to 535,714 additional shares of common stock to cover over-allotments, and Sonim's IPO began.  *See* Press Release, *Sonim Technologies Announces Pricing of Initial Public Offering* (May 9, 2019).

44.   On May 10, 2019, Sonim's stock began publicly trading on the Nasdaq Global Market under the ticker symbol "SONM."  *See id.*

45.   On May 13, 2019, Sonim filed the Final Prospectus for the IPO, which forms part of the Registration Statement, and sold 3,571,429 shares of Sonim common stock to the investing public at $11 per share for net proceeds of approximately $36.5 million, after excluding $2.75 million in discounts and commissions paid to the Underwriter Defendants.

46.   On May 22, 2019, Sonim sold an additional 505,714 registered Sonim shares and Plaschke sold an additional 30,000 registered Sonim shares at $11.00 per share pursuant to the exercise of the underwriters' option to purchase additional shares in the IPO.  *See* Press Release, *Sonim Technologies Announces Exercise and Closing of Over-Allotment Option of Initial Public Offering* (May 22, 2019).  Thus, as a result of the IPO, Sonim raised approximately $37.5 million in aggregate net proceeds from the IPO, after excluding $3.1 million in discounts and commissions paid to the Underwriter Defendants.  *Id.*

**D.    False And/Or Misleading Statements In The Registration Statement**

47.   In their capacities as signers of the Registration Statement and/or an issuer, statutory seller, offeror, control persons and/or underwriter of the shares sold pursuant to the Registration Statement, each of the Defendants are liable for the misstatements and omissions alleged herein pursuant to §§11 and 15 of the Securities Act.  With respect to statements flagged as false and/or misleading in this Complaint, the statements being challenged as false and/or misleading are those statements that are ***bolded, italicized, underlined, or otherwise highlighted*** for emphasis in this section of the Complaint.

48.   The first page of the Registration Statement stated, in relevant part:

We are a leading U.S. provider of ultra-rugged mobile phones and accessories designed specifically for task workers physically engaged in their work environments, often in mission-critical roles. We currently sell our ruggedized mobile phones and accessories to three of the four largest wireless carriers in the

13

1
2

United States—AT&T, Sprint and Verizon—as well as the three largest wireless carriers in Canada—Bell, Rogers and Telus Mobility. ***Our phones and accessories connect workers with voice, data and workflow applications*** *in two end markets: industrial enterprise and public sector.*

3
4
5
6
7
8

Task workers in these end markets have historically been limited to pen and paper and single-purpose electronic devices, such as barcode scanners, location-tracking devices and sensors, to accomplish specific daily tasks. These single-purpose devices have historically run on proprietary networks, such as land mobile radio, or LMR, networks, which enable push-to-talk, or PTT, services for voice communications. ***We provide Android-based devices that consolidate and integrate multiple functions into a single ruggedized solution running on commercial wireless networks at a total cost of ownership that we believe is significantly lower than comparable offerings with improved productivity and safety of task workers.***

9       49.     The foregoing statements in ¶48 above regarding the capabilities of Sonim's

10   phones were materially false and/or misleading when made because they failed to disclose to

11   investors that: (1) Sonim's phones were defective due to the XP8 Chipset Defect and the

12   XP3/XP5s Software Failure, ¶¶37, 40, 67, 68; (2) the early adoption of the Snapdragon chipset

13   resulted in the XP8 Chipset Defect, ¶¶37, 67; (3) Sonim did not adequately test the XP8 to

14   detect and resolve the XP8 Chipset Defect, ¶¶37, 67; (4) XP8 customers were complaining of

15   connectivity issues as a result of the XP8 Chipset Defect, ¶¶41-42; (5) the XP8 Chipset defect

16   was negatively impacting Sonim's sales of the XP8, ¶¶66-67; (6) Sonim did not adequately test

17   the XP3 and XP5s in "mission-critical" environments, ¶¶40, 68; (7) Sonim had not resolved the

18   XP3/XP5s Software Failures before the IPO, ¶¶66, 68; and (8) the XP3/XP5s Software Failure

19   was negatively impacting sales of the XP3 and XP5s, ¶¶66, 68.

20       50.     The second page of the Registration Statement stated, in relevant part:

21
22
23

Communication, productivity and safety among task workers has always been a central requirement in business-critical and mission-critical environments. Organizations with remote and disparate workers—from police and firefighters to construction, oil rig and manufacturing workers—need an extremely durable solution that provides reliable and secure voice, data and workflow applications.

24
25
26

Ruggedized mobile phones are well-suited for industrial enterprise and other critical infrastructure applications due to their durability and functionality in a range of environments. Equipping workers with smarter mobile phones also enables more efficient communication with and between field employees, and enhances the information that decision-makers use to deploy resources within their organizations.

27

*Industrial Enterprise Market Opportunity*

28

We estimate that in the United States and Canada in 2018, there were 37.6 million

14

task workers across verticals in our industrial enterprise end markets who could benefit from our solutions, including construction, energy and utility, facilities management, manufacturing and transportation and logistics. *The extreme durability and **enhanced voice and text communication capabilities of our devices enable these workers to be stationed in remote and hazardous environments, while remaining connected to their central command center <u>at all times</u>***.

51.     The foregoing statements in ¶50 above regarding the capabilities of Sonim's phones were materially false and/or misleading when made because they failed to disclose to investors that: (1) Sonim's phones were defective due to the XP8 Chipset Defect and the XP3/XP5s Software Failure, ¶¶37, 40, 67, 68; (2) the early adoption of the Snapdragon chipset resulted in the XP8 Chipset Defect, ¶37, 67; (3) Sonim did not adequately test the XP8 to detect and resolve the XP8 Chipset Defect, ¶¶37, 67; (4) XP8 customers were complaining of connectivity issues as a result of the XP8 Chipset Defect, ¶¶41-42; (5) the XP8 Chipset defect was negatively impacting Sonim's sales of the XP8, ¶¶66-67; (6) Sonim did not adequately test the XP3 and XP5s in "mission-critical" environments, ¶¶40, 68; (7) Sonim had not resolved the XP3/XP5s Software Failures before the IPO, ¶¶66, 68; and (8) the XP3/XP5s Software Failure was negatively impacting sales of the XP3 and XP5s, ¶¶66, 68.

52.     The Management Discussion and Analysis (MD&A) portion of the Registration Statement stated, in relevant part, "***<u>Our phones and accessories connect workers with voice, data and workflow applications</u> in two end-markets: industrial enterprise and public sector***."

53.     The foregoing statement in ¶52 above regarding the capabilities of Sonim's phones was materially false and/or misleading when made because it failed to disclose to investors that: (1) Sonim's phones were defective due to the XP8 Chipset Defect and the XP3/XP5s Software Failure, ¶¶37, 40, 67, 68; (2) the early adoption of the Snapdragon chipset resulted in the XP8 Chipset Defect, ¶37, 67; (3) Sonim did not adequately test the XP8 to detect and resolve the XP8 Chipset Defect, ¶¶37, 67; (4) XP8 customers were complaining of connectivity issues as a result of the XP8 Chipset Defect, ¶¶41-42; (5) the XP8 Chipset defect was negatively impacting Sonim's sales of the XP8, ¶¶66-67; (6) Sonim did not adequately test the XP3 and XP5s in "mission-critical" environments, ¶¶40, 68; (7) Sonim had not resolved the XP3/XP5s Software Failures before the IPO, ¶¶66, 68; and (8) the XP3/XP5s Software Failure

was negatively impacting sales of the XP3 and XP5s, ¶¶66, 68.

54. The Registration Statement also stated, in relevant part:

*Our mobile phones. . . use[] noise cancellation technology for loud background noise environments.*

* * *

Enhanced functionality through software and hardware configurations. Our solutions allow end customers and task workers to customize our mobile phones using Android-based applications and vertical-specific accessories to address their varying needs. Enterprises and agencies can leverage the millions of applications available on the Google Play Store, our dozens of device-specific APIs, and our industrial accessories to create a purpose-built solution to meet the specific use cases of their task workers. *For example, school bus operators can combine our ruggedized phones, an industrial car kit, a PTT application that leverages our APIs and a location-tracking application to ensure that they have a solution that enables <u>constant communication</u> with dispatchers that is compliant with the U.S. Department of Transportation's hands-free driving regulations and that can also automatically alert parents of route delays*. The ability for enterprises and agencies to customize their solutions allows their task workers to use a single device for tasks that would previously require multiple and often more costly devices.

* * *

*In addition, our devices provide a wide range of connectivity options for our end customers (including LTE, 3G, GSM, WiFi, NFC, location tracking and Bluetooth for certain of our devices), and our XP5s and XP8 phones support a wide range of global frequencies allowing them to be used almost anywhere in the world where there is cellular coverage.*

55. The foregoing statements in ¶54 above regarding the capabilities of Sonim's phones were materially false and/or misleading when made because they failed to disclose to investors that: (1) Sonim's phones were defective due to the XP8 Chipset Defect and the XP3/XP5s Software Failure, ¶¶37, 40, 67, 68; (2) the early adoption of the Snapdragon chipset resulted in the XP8 Chipset Defect, ¶¶37, 67; (3) Sonim did not adequately test the XP8 to detect and resolve the XP8 Chipset Defect, ¶¶37, 67; (4) XP8 customers were complaining of connectivity issues as a result of the XP8 Chipset Defect, ¶¶41-42; (5) the XP8 Chipset defect was negatively impacting Sonim's sales of the XP8, ¶¶66-67; (6) Sonim did not adequately test the XP3 and XP5s in "mission-critical" environments, ¶¶40, 68; (7) Sonim had not resolved the XP3/XP5s Software Failures before the IPO, ¶¶66, 68; and (8) the XP3/XP5s Software Failure was negatively impacting sales of the XP3 and XP5s, ¶¶66, 68.

56.     When describing the risks affecting Sonim's business, the Registration Statement stated, "***Defects in our products <u>could</u> reduce demand for our products and result in a loss of sales, delay in market acceptance and injury to our reputation, which would adversely impact our business.***"

57.     The foregoing statement in ¶56 above regarding the capabilities of Sonim's phones was materially false and/or misleading when made because it failed to disclose to investors that: (1) Sonim's phones were defective due to the XP8 Chipset Defect and the XP3/XP5s Software Failure, ¶¶37, 40, 67, 68; (2) the early adoption of the Snapdragon chipset resulted in the XP8 Chipset Defect, ¶¶37, 67; (3) Sonim did not adequately test the XP8 to detect and resolve the XP8 Chipset Defect, ¶¶37, 67; (4) XP8 customers were complaining of connectivity issues as a result of the XP8 Chipset Defect, ¶¶41-42; (5) the XP8 Chipset defect was negatively impacting Sonim's sales of the XP8, ¶¶66-67; (6) Sonim did not adequately test the XP3 and XP5s in "mission-critical" environments, ¶¶40, 68; (7) Sonim had not resolved the XP3/XP5s Software Failures before the IPO, ¶¶66, 68; and (8) the XP3/XP5s Software Failure was negatively impacting sales of the XP3 and XP5s, ¶¶66, 68.

58.     The Risk Factors portion of the Registration Statement also stated, in relevant part:

> ***Complex software, components and assemblies used in our products <u>may</u> contain undetected defects that are subsequently discovered at any point in the life of the product***. For example, in 2018, we recalled one batch of our XP8 devices from two wireless carriers due to manufacturing defects. ***Defects in our products <u>may</u> result in a loss of sales, delay in market acceptance and injury to our reputation and increased warranty costs.***
>
> ***Additionally, our software <u>may</u> contain undetected errors, defects or bugs. <u>Although we have not suffered significant harm from any errors, defects or bugs to date</u>, we <u>may</u> discover significant errors, defects, or bugs in the future that we may not be able to correct or correct in a timely manner***. It is possible that errors, defects or bugs will be found in our existing or future software products and related services with the potential for delays in, or loss of market acceptance of, our products and services, diversion of our resources, injury to our reputation, increased service and warranty expenses, and payment of damages.

59.     The foregoing statements in ¶58 above regarding the capabilities of Sonim's phones were materially false and/or misleading when made because they failed to disclose to investors that: (1) Sonim's phones were defective due to the XP8 Chipset Defect and the

XP3/XP5s Software Failure, ¶¶37, 40, 67, 68; (2) the early adoption of the Snapdragon chipset resulted in the XP8 Chipset Defect, ¶¶37, 67; (3) Sonim did not adequately test the XP8 to detect and resolve the XP8 Chipset Defect, ¶¶37, 67; (4) XP8 customers were complaining of connectivity issues as a result of the XP8 Chipset Defect, ¶¶41-42; (5) the XP8 Chipset defect was negatively impacting Sonim's sales of the XP8, ¶¶66-67; (6) Sonim did not adequately test the XP3 and XP5s in "mission-critical" environments, ¶¶40, 68; (7) Sonim had not resolved the XP3/XP5s Software Failures before the IPO, ¶¶66, 68; and (8) the XP3/XP5s Software Failure was negatively impacting sales of the XP3 and XP5s, ¶¶66, 68.

60.     As well, the Risk Factors portion of the Registration Statement stated, in relevant part, "***When the product is close to being a functioning model, we commence internal quality assurance processes and field testing***, which may include third-party lab testing, ***in-market field testing and interoperability testing***."

61.     The foregoing statement in ¶60 above regarding the capabilities of Sonim's phones was materially false and/or misleading when made because it failed to disclose to investors that: (1) Sonim's phones were defective due to the XP8 Chipset Defect and the XP3/XP5s Software Failure, ¶¶37, 40, 67, 68; (2) the early adoption of the Snapdragon chipset resulted in the XP8 Chipset Defect, ¶¶37, 67; (3) Sonim did not adequately test the XP8 to detect and resolve the XP8 Chipset Defect, ¶¶37, 67; (4) XP8 customers were complaining of connectivity issues as a result of the XP8 Chipset Defect, ¶¶41-42; (5) the XP8 Chipset defect was negatively impacting Sonim's sales of the XP8, ¶¶66-67; (6) Sonim did not adequately test the XP3 and XP5s in "mission-critical" environments, ¶¶40, 68; (7) Sonim had not resolved the XP3/XP5s Software Failures before the IPO, ¶¶66, 68; and (8) the XP3/XP5s Software Failure was negatively impacting sales of the XP3 and XP5s, ¶¶66, 68.

62.     The Risk Factors portion of the Registration Statement also stated, in relevant part:

> ***Our sales arrangements also generally include technical performance standards for our mobile phones and accessories sold, which vary by channel partner***. *If a technical issue with any of our covered products exceeds certain preset failure thresholds for the relevant performance standard or standards, the channel partner typically has the right to cease selling the product, cancel open purchase orders and levy certain monetary penaltie*s. *If our products*

*suffer technical issues or failures following sales to our channel partners, we may be subject to significant monetary penalties and our channel partners may cease making purchase orders, which would significantly harm our business and results of operations*.

63. The foregoing statements in ¶62 above regarding the capabilities of Sonim's phones were materially false and/or misleading when made because they failed to disclose to investors that: (1) Sonim's phones were defective due to the XP8 Chipset Defect and the XP3/XP5s Software Failure, ¶¶37, 40, 67, 68; (2) the early adoption of the Snapdragon chipset resulted in the XP8 Chipset Defect, ¶¶37, 67; (3) Sonim did not adequately test the XP8 to detect and resolve the XP8 Chipset Defect, ¶¶37, 67; (4) XP8 customers were complaining of connectivity issues as a result of the XP8 Chipset Defect, ¶¶41-42; (5) the XP8 Chipset defect was negatively impacting Sonim's sales of the XP8, ¶¶66-67; (6) Sonim did not adequately test the XP3 and XP5s in "mission-critical" environments, ¶¶40, 68; (7) Sonim had not resolved the XP3/XP5s Software Failures before the IPO, ¶¶66, 68; and (8) the XP3/XP5s Software Failure was negatively impacting sales of the XP3 and XP5s, ¶¶66, 68.

64. Defendants further violated their independent, affirmative duty to adequately "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. § 229.503(c).  In contravention to Item 503 of SEC Registration S-K, 17 C.F.R. § 229.503(c), Defendants failed to disclose the risks to Sonim's sales of its phones as a result of the XP8 Chipset Defect and the XP3/XP5s Software Failure.

**E.    Sonim Reveals XP8 Chipset Defect And XP3/XP5s Software Failure**

65. On September 10, 2019, pre-market open, Sonim issued a press release titled, "Sonim Technologies Provides Corporate Update," wherein it announced that the Company was updating its financial guidance for the fiscal year ending December 31, 2019 and that CFO Walker was resigning.  With respect to the XP8 and "feature phones," *i.e.*, the XP5s and XP3, the press release stated in relevant part:

> *[T]he company has experienced technical challenges related to its XP8 smartphone and other general non-systemic, accessory-related issues in its feature phones, which cumulatively resulted in lost sales momentum*. These challenges have diverted resources away from launching smaller Tier 2 carrier customers and, as such, delayed the launch of Sonim devices to their customer base. The company believes that these issues are being remediated, and Sonim expects the bulk of the Tier 2 carriers to launch Sonim products in the latter part

1  of 2019.

2  Press Release, *Sonim Technologies Provides Corporate Update* (Sept. 10, 2019).  As well,

3  Sonim reduced its guidance for the year ending December 31, 2019 from an "increase between

4  25% and 30% compared to $135.7 million reported in fiscal 2018," Sonim, *Sonim Technologies*

5  *Reports Second Quarter and Six Month 2019 Financial Results* (July 24, 2019), to "flat or

6  slightly below 2018's net revenue of $135.7 million[.]"  Press Release, *Sonim Technologies*

7  *Provides Corporate Update* (Sept. 10, 2019).

8  66.   On that same day, Sonim held a conference call with investors to discuss

9  Sonim's updated guidance and the Company's corporate update issued that day.  During the

10  conference call, Plaschke revealed that the XP8 Chipset Defect and XP3/XP5s Software Failure

11  had resulted in "*lost sales momentum in the __second__ and third quarter*," which are the periods

12  covering April 2019 through the end of September 2019.  Sonim, *Sonim Technologies Inc To*

13  *Discuss Business Update and Fiscal 2019 Financial Guidance Call*, at 2 (Sept. 10, 2019)

14  (transcript available at FD (Fair Disclosure) Wire).  The second quarter began on April 1, 2019,

15  before the IPO.  *See* Sonim, Quarterly Report on Form 10-Q, at 2 (Aug. 13, 2019).  Thus, at the

16  time of the IPO, and unbeknownst to investors at the time, *Sonim was already experiencing*

17  *lost sales momentum* as a result of the XP8 Chipset Defect and XP5s/XP3 Software Issues.

18  67.   With respect to the XP8 Chipset Defect, Plaschke stated, in relevant part:

19  The carrier subsidies and sales plan deviated from our expectations and there were
20  significant changes in the rollout of these efforts and as a result, resulted in a
reduction of our expected net revenues for the second half of this year.
21  *Additionally, we did experience some software challenges related to our XP8*
*smartphone and some other general non-systemic accessory-related issues with*
22  *our feature phones*."

23  Sonim, *Sonim Technologies Inc To Discuss Business Update and Fiscal 2019 Financial*

24  *Guidance Call*, at 2 (Sept. 10, 2019) (transcript available at FD (Fair Disclosure) Wire).

25  Plaschke further explained that the XP8 Chipset Defect arose out of its decision to be an early

26  adopter of a Qualcomm chipset—the Snapdragon— and Sonim's choice to act as a "beta

27  customer" for Qualcomm, stating:

28  On the XP8, we picked a chipset that explicitly because it supported band class
14.  It was the first chipset available what's called a kind of mid-tier that

20

Qualcomm provides that support band class 14, and so we in conjunction working with AT&T, to get the products out. We picked the first available -- the chipset that was most -- earliest available to get band class 14 up and running.

***This chipset that Qualcomm when it releases chipsets, they don't really yet – don't really have a -- and again I don't want to speak for Qualcomm, but the -- you take a gamble on whether you're going to be the first chipset in a particular region of the world. It turns out that the chipset that we launched, we were the first to launch it in -- at least from our -- from what we understand, the first to launch at North America***.

***And when you do that, you unintentionally take -- you unintentionally become the kind of the beta customer for that chipset and then you face a number of what I'd called network-related issues in terms of how the chipset works with the network configurations in the carriers in that particular region and they differ region to region***. So we -- that has -- that has been a unexpected kind of drag coefficient for us. ***A number of corner cases emerged in terms of what would -- how the phone operate in different parts of the country based off the different network configurations.*** And we have finally ***I think gotten over the hump in terms of getting that -- those fixes made***. Those are software changes happily, so that they can be communicated over the air but it's taken us a number of maintenance releases and a number of -- a lot of work with Qualcomm to kind of get there.

It's not a -- so it's -- you wouldn't -- I don't know if you'd called it quality issue, just call it basically a new product introduction issue that we happen to be first. Typically, we try to, to your point or your question, we try not to be the first OEM to release a chipset in a particular region. ***But because of the importance of getting band class 14 out, we unintentionally took that risk, so that's the XP8***.

Sonim, *Sonim Technologies Inc To Discuss Business Update and Fiscal 2019 Financial Guidance Call*, at 7 (Sept. 10, 2019) (transcript available at FD (Fair Disclosure) Wire).

68.     During that conference call, Plaschke also revealed to investors that the XP5s and XP3 were also inadequately field-tested and described the XP3/XP5s Software Failure. Plaschke stated, in relevant part:

***On the XP5s and the XP3, the phones are used in a number of scenarios that are not necessarily easy to test***. These are used in mission critical or what we called business critical scenarios where they are -- they are put in combination with other accessories and put in unusual situations.

So, I'll give you an example. ***You have a school bus company who has a certain wiring configuration to the little, the kind of a holder where you put the phone in, and that wiring configuration as it turns out if it's not -- if it's not, I don't know what the right word is, if it's not optimized can created feedback that can affect the noise cancellation software on the phone***.

***These are as you might expect not easy things to debug before you launch and frankly we just -- we kind of have to take on the chin to get these problems fixed***. The silver lining is that and there's multiple examples in this context of these what I would call very industrialized use cases, the silver lining is that once we figured this stuff out, we become the de facto answer for carriers to solve these

21

tough industrial use cases where they're not going to put a normal consumer cell phone into that scenario.

Sonim, *Sonim Technologies Inc To Discuss Business Update and Fiscal 2019 Financial Guidance Call*, at 7 (Sept. 10, 2019) (transcript available at FD (Fair Disclosure) Wire).

69.     Analysts reacted negatively to Sonim's revelations.  Defendant Oppenheimer issued an analyst report on the same day of Sonim's revelations, stating:

> ***We won't defend the indefensible***. ***What could go wrong for Sonim went wrong***. A large new customer lowered sales forecasts, delayed subsidies, and has been slower than expected in stocking retail locations. ***Additionally, the company experienced technical challenges in both the XP8 smartphone and accessory-related issues in its feature phones***. Finally, working through these issues has slowed down rollouts to smaller carrier customers. ***Put together, sales momentum has slowed and guidance was significantly cut. More importantly, management has lost credibility and the stock has become a show-me stock***.

70.     Defendant Lake Street also lowered its price target of Sonim, stating, "[T]he Company ***had software issues with some of its devices*** which diverted resources away from launching at Tier 2 carriers."  As well, Defendant NSC lowered its price target of Sonim to from $17 to $9.

71.     On news of these revelations, Sonim's stock price dropped 46.74%, or $3.30, from a closing price of $7.06 per share on September 9, 2019 to a closing price of $3.76 per share on September 10, 2019.

72.     As of the filing of the first-filed action on October 7, 2019, *Malhotra v. Sonim Technologies, Inc., et al.*, No. 3:19-cv-06416-MMC, ECF No. 1, Sonim's stock price closed at $3.15 per share on that day—well below the $11 per share IPO price.

**V.     CLASS ACTION ALLEGATIONS**

73.     Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities who purchased Sonim common stock pursuant or traceable to the Registration Statement issued in connection with Sonim's IPO, and who were damaged thereby, seeking to pursue remedies under the Securities Act.

74.     Excluded from the Class are Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual

22

or entity in which a Defendant has a controlling interest or which is related to or affiliated with any Defendants (defined below), and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

75.     The members of the Class are so numerous that joinder of all members is impracticable.  During the relevant time period, Sonim common stock was actively traded on the NASDAQ Global Select Market.  While the exact number of Class members cannot be determined at this early stage and can only be ascertained through appropriate discovery, Plaintiff believes that the proposed Class numbers in the thousands.  Record owners and other members of the Class may be identified from records maintained by Sonim or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

76.     Plaintiff's claims are typical of the claims of the other members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Securities Act as complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class.

78.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)     whether the Registration Statement was negligently prepared and contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c)     whether the Individual Defendants were controlling persons of Sonim; and

1           d)      whether the members of the Class have sustained damages as a result of

2 the conduct complained of herein and, if so, the proper measure of damages.

3         79.      Plaintiff knows of no difficulty that will be encountered in the management of

4 this action that would preclude its maintenance as a class action.

5         80.      A class action is superior to all other available methods for the fair and efficient

6 adjudication of this action because, among other things, joinder of all members of the Class is

7 impracticable.  In addition, since the damages suffered by individual members of the Class may

8 be relatively small, the expense and burden of individual litigation would make it nearly

9 impossible for members of the Class to bring individual actions.

10 **VI.     CLAIMS FOR RELIEF**

11
                                     **<u>COUNT I</u>**
**For Violations of Section 11 of the Securities Act**
12                                 **Against All Defendants**

13         81.      Plaintiff repeats and realleges each allegation above as if fully set forth herein.

14 This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or

15 motive are specifically excluded.  For purposes of asserting this and other claims under the

16 Securities Act, Plaintiff does not allege that the Defendants acted with intentional, reckless, or

17 otherwise fraudulent intent.

18         82.      This Count is asserted against the Defendants for violations of Section 11 of the

19 Securities Act (15 U.S.C. § 77k), on behalf of all Class members who purchased Sonim

20 common stock pursuant to or traceable to the IPO.  The Registration Statement contained

21 misrepresentations of material facts and omitted to state material facts required to be stated in

22 order to make the statements contained therein not misleading.

23         83.      Liability under this Count is predicated on the Defendants' participation in the

24 IPO.

25         84.      As the issuer of the registered securities, Sonim is strictly liable for the

26 misleading statements and omission of material facts described herein.

27         85.      None of the other Defendants made a reasonable investigation or possessed

28 reasonable grounds for the belief that the statements contained in the Registration Statement

1   were true or that there was no omission of material facts necessary to make the statements made

2   therein not misleading.

3        86.     The Defendants issued, caused to be issued, and participated in the issuance of

4   materially false and misleading statements to the investing public that were contained in the

5   Registration Statement, and that misrepresented and/or failed to disclose, inter alia, the facts set

6   forth above.

7        87.     This action was brought within one year after the discovery of the untruthfulness

8   of the statements and omissions or after such discovery should have been made by the exercise

9   of reasonable diligence and within three years after Sonim common stock was offered to the

10  public.

11       88.     Class members who purchased or otherwise acquired Sonim common stock

12  pursuant to traceable to the IPO's Registration Statement did not know, nor in the exercise of

13  reasonable diligence could they have known, that the Registration Statement contained untrue

14  statements of material fact and omitted to state material facts required to be stated or necessary

15  to make the statements particularized above not misleading when they purchased the registered

16  securities.

17       89.     As a result of the foregoing, Defendants are liable under Section 11 of the

18  Securities Act to the members of the Class who purchased or otherwise acquired Sonim

19  common stock sold pursuant and/or traceable to the Registration Statement.

20                                 **COUNT II**
21            **For Violations of Section 15 of the Securities Act Against
               the Individual Defendants**

22       90.     Plaintiff repeats and realleges each allegation above as if fully set forth herein.

23  This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or

24  motive are specifically excluded.  For purposes of asserting this and other claims under the

25  Securities Act, Plaintiff does not allege that Defendants acted with intentional, reckless, or

26  otherwise fraudulent intent.

27       91.     This Count is alleged against the Individual Defendants for violations of Section

28  15 of the Securities Act (15 U.S.C. § 77o), on behalf of Plaintiff and the other Class members

                                        25

who purchased Sonim common stock sold pursuant to or traceable to the IPO's Registration Statement.

92.     As set forth in Count I herein, Sonim is liable pursuant to Section 11 of the Securities Act.  At all relevant times, the Individual Defendants were controlling persons of Sonim within the meaning of Section 15 of the Securities Act.  The Individual Defendants served as executive officers and/or directors of Sonim prior to and at the time of the IPO as alleged herein.

93.     Each of the Individual Defendants was a participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and having otherwise participated in the process that allowed the IPO to be executed. The Individual Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company, as well as the content of the Registration Statement, at the time of the IPO.  Each of the Individual Defendants was provided with or had unlimited access to the Registration Statement, and had the ability to prevent its issuance or cause it to be corrected.

94.     This action was brought within one year after the discovery of the untruthfulness of the statements and omissions or after such discovery should have been made by the exercise of reasonable diligence and within three years after Sonim common stock was offered to the public.

95.     As a result of the foregoing, the Individual Defendants are liable under Section 15 of the Securities Act, to the same extent that Sonim is liable under Section 11 of the Securities Act.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for relief and judgment including:

A.     Determining that Counts I through II of this action are a proper class action under Federal Rules of Civil Procedure 23, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other relevant Class members against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.     Awarding rescissory damages in favor of Plaintiff and the other relevant Class members where appropriate against all of the Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

D.     Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

E.     Awarding Plaintiff and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

96.     Awarding such other and further relief as may be just and proper.

## VIII.   JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated: February 24, 2020                    **FARUQI & FARUQI, LLP**

By:  */s/ Richard W. Gonnello*
        Richard W. Gonnello

Richard W. Gonnello (admitted *pro hac vice*)
Katherine M. Lenahan (admitted *pro hac vice*)
Sherief Morsy (admitted *pro hac vice*)
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: rgonnello@faruqilaw.com
          klenahan @faruqilaw.com
          smorsy@faruqilaw.com

Benjamin Heikali SBN 307466
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
Email:  bheikali@faruqilaw.com

*Attorneys for Lead Plaintiff David Sterrett*

27