**Pages 1 - 70**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

| | |
|---|---|
| DAVID STERRETT, Individually and on Behalf of All Others Similarly Situated, )<br><br>          Plaintiff,          )<br><br>  VS.                              )<br><br>SONIM TECHNOLOGIES, INC., et al.,                          )<br><br>          Defendants.          ) | **No. C 19-6416 MMC**<br><br><br><br>San Francisco, California<br>Friday, October 30, 2020 |

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:   (via Zoom Video Conferencing)

For Class Representative David Sterrett and Class Counsel for the Settlement Class:

> FARUQI & FARUQI, LLP
> 685 Third Avenue, 26th Floor
> New York, New York 10017
> BY:  **RICHARD W. GONNELLO, ESQ.**
>      **KATHERINE M. LENAHAN, ESQ.**

For Defendants Oppenheimer & Co. Inc., Lake Street Capital Markets, LLC, and National Securities Corporation.

> SIDLEY AUSTIN LLP
> 1001 Page Mill Road, Bldg. 1
> Palo Alto, California 94304
> BY:  **MATTHEW J. DOLAN, ESQ.**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

**APPEARANCES:** (via Zoom Webinar; continued)

For Defendants Sonim Technologies, Inc., Robert Plaschke, James
Walker, Maurice Hochschild, Alan Howe, Kenny Young,
Susan G. Swenson, John Kneuer, and Jeffrey D. Johnson:

                    O'MELVENY & MYERS LLP
                    400 S. Hope Street
                    Los Angeles, California 90071-2899
            BY:  **MATTHEW W. CLOSE, ESQ.**

**Friday - October 30, 2020**                              **9:01 a.m.**

                          **P R O C E E D I N G S**

                               ---oOo---

THE COURT:  All right.  Good morning.  We are proceeding at this time with our hearing calendar proceeding by way of a Zoom hearing in light of the pandemic and the general orders of the Northern District.

I would ask our courtroom deputy clerk to call the case at this time, please.  Thank you.

THE CLERK:  Calling civil 19-6416, Ajay Malhotra versus Sonim Technologies, Inc.

Counsel for the plaintiff.

MR. GONNELLO:  This is Richard Gonnello, of Faruqi & Faruqi, on behalf of lead plaintiff David Sterrett. Good morning, Your Honor.

THE COURT:  Good morning.  The defendant, who I think is muted.  Can't tell.

MR. CLOSE:  Good morning, Your Honor.  I know Mr. Gonnello has a partner with him, so if it's all right with the Court I'll let her make her appearance for the plaintiff too.

THE COURT:  Oh, that's fine, yes.

MS. LENAHAN:  This is Katherine Lenahan on behalf of lead plaintiff David Sterrett.

THE COURT:  All right.  Thank you.  Who's actually

going to take the lead in responding to questions and primarily participating in the hearing this morning, Ms. Lenahan or Mr. Gonnello?

MS. LENAHAN:  That will be me, Ms. Lenahan.

THE COURT:  All right.  Very good.  Thank you.

All right.  Then turning to the defendants.

MR. CLOSE:  Good morning, Your Honor.  Matthew Close, O'Melveny & Myers LLP, for Sonim Technologies and the individual defendants.

Your Honor, there's another group of defendants, the underwriter defendants --

THE COURT:  Yes.

MR. CLOSE:  -- represented by Matt Dolan, of Sidley Austin.  And he has indicated to me that he's in the waiting room.

THE COURT:  Oh.  All right.

Ms. Clark, are you able to let him in?

MR. CLOSE:  Thank you, Your Honor.

THE CLERK:  Yes, Your Honor.

THE COURT:  Okay.  Let's see.  Oh, there he is.

Do you want to make an appearance then, Mr. Dolan.  State who you're appearing for this morning.

MR. DOLAN:  Sure.  Good morning, Your Honor.  Matt Dolan, from Sidley Austin, on behalf of the underwriter defendants.

**THE COURT:** Okay. We have a fair amount of work this morning. I am actually not sitting on the bench, though it looks somewhat like I am, and if I start blurring because of the virtual background I may switch. But at the moment I'll stay with what I have. I'm going to have to be turning around a lot and looking at papers.

All right. So we're dealing with motion for preliminary approval of a class action settlement. Even though this isn't final approval, I have always felt, and now our court as a whole has certain guidelines, with respect to preliminary approval hearings that we get out primarily the information that the parties who are asking for approval would rely on at the time of a final hearing because, otherwise, we're going to go through all the effort of notifying a bunch of people about something that otherwise might never go anywhere.

So there are questions here that I have that perhaps have not been fully answered, and I want to go over those.

Let me start just by a general overview of the settlement. I just want to take a look.

The fund that's being put forward by the defendant -- now, do I understand this is just the defendant Sonim that is going to be contributing to the settlement here?

**MS. LENAHAN:** That is correct, Your Honor.

**THE COURT:** Okay. All right. So, in any event, then Sonim would be putting up a fund of $2 million, and that would

get divided up in a way that, according to the calculation that was made generally here, it's somewhere around 1,000,385.7 for the class.

Class counsel are asking for a 25 percent award of the fund.  They expect there'll be expenses around 50,000.

There's the single named plaintiff as lead plaintiff asking for a $2,500 incentive, which is not overly high, at least at first impression.

There's a question -- oh, there's the administration of the settlement, the class notice and things of that nature, that counsel are estimating to be somewhere close to 62,000.

Then there's a question of reimbursement of costs for brokers and nominees who may have to get in touch with the individuals for whom they're holding shares.

And we'll talk about all that.

There's a claim form that's required that's fairly complex but is not really much out of line with these types of settlements in securities actions where people have to indicate what they bought and when, things of that nature.

This question about interest on the award, maybe I'll ask plaintiff's counsel about that.  It isn't clear to me exactly what is being asked for and why.  I don't know that I've seen this before.

So perhaps, Ms. Lenahan, you could explain that request.

**MS. LENAHAN:**  Certainly, Your Honor.

This is -- we often ask for interest on the requested attorneys' fees.  And that would be basically any interest that's accrued on the amount in the settlement fund between the time of when the fee order is -- I'm sorry -- between the time that the money is put in the account and the time that we are allowed to take the money out of the account.

So it would be -- since we're asking for 25 percent, it would be 25 percent of the interest.

**THE COURT:**  I'm not sure I'm getting this.  Let me see.  Generally speaking, the payments are not made until after final approval.

Are you indicating that in this instance the money is going to be deposited upfront and will earn interest during the time we're going through the process of deciding whether there will be final approval and distribution?

**MS. LENAHAN:**  That is correct, Your Honor.  I believe the money is deposited into the escrow account shortly after preliminary approval.  And from the date it's deposited, it will most likely earn interest between that time and the time that attorneys' fees are paid out.

**THE COURT:**  All right.  If the money is earning interest, then to the extent that it's going to the class members, the class members should get that benefit.  And what you are asking for, then, is whatever interest accrued on the sum that you are hoping will be awarded to counsel.

Is that the idea?

**MS. LENAHAN:**  Yes, that is correct.

**THE COURT:**  Okay.  That might be okay as long as that's clear.  It looked like you were asking for prejudgment interest or something and I was thinking no.

All right.  So if what you're asking for is, if the money earned interest, rather than give the interest earned on the 500,000, if that is what's awarded, rather than distributed it to the class that it go to counsel.

**MS. LENAHAN:**  Correct.

**THE COURT:**  All right.  They're putting it up.  It's in escrow.  If they've given it to you to start with on a promise you'd give it back if you didn't get it awarded, you would have earned interest and it would have gone back to them.  So, okay.  I see the idea.

All right.  Let's keep going.  Of course, the Court at the ultimate determination, if we get to that point, would be required to consider a number of factors.  There are the factors set out in Rule 23.

And then the Ninth Circuit has laid out a set of factors that essentially overlap pretty much with Rule 23.  And we can take those up in the course of this proceeding, and then any questions I have as we go along that may bear on those matters I'll ask you.

Of course, the strength of the plaintiff's case, that's

something I do want to ask you about.  The risk, expense, complexity, and the likely duration of the case going all the way through trial, et cetera.

The risk of maintaining class action status, that may be a little less of a risk in a case such as this than some of the other types of cases we may see that come out of the employment area, for example, or other cases where parties may not be similarly situated.

Of course, the amount of the settlement, what discovery has been done, the experience of counsel, whether there's a government participant, the class reaction, and if there's been any type of collusion between counsel in getting the case settled.

Let's take a look at the strength of the plaintiff's case for a moment.  As I understand it, if there is a false statement made, in other words, if there's a cognizable, actionable false statement that -- under the PSLRA claims being brought here, it is not necessary that the plaintiff show that the defendant intended to mislead anyone.  Somewhat of an absolute liability.

If it's not true, you're stuck.  Is that correct? Ms. Lenahan, is that your understanding?

**MS. LENAHAN:**  Yes, Your Honor.  The Section 11 claims are strict liability as to the company, but the underwriter defendants and some of the individual defendants would have,

potentially, defenses.  And the underwriter defendants would have a due diligence defense.

THE COURT:  Okay.  So on the part of Sonim, who is the party that is funding this settlement, we do have a strict liability doctrine, essentially.

However, there are, as I understand it, some defenses here because from the estimate being made the fund that's being put up represents essentially about a 6 percent recovery on a good day and maybe 14 percent on a real day.  That's a major differential.  So I'd like to ask a little bit about that too.

But the defenses really weren't fully laid out here.  And I'm not asking you to make them at this time and cut against your case, Ms. Lenahan, but I might turn to Mr. Close for a moment and see if there's something that you would like to put on the record.

Part of it, I understand you're arguing that they weren't necessarily false when they were made, that there's some amount of puffery here.  But go ahead and flesh out some of the defenses on behalf of your client, if you would.

MR. CLOSE:  Thank you, Your Honor.  Matthew Close, for the record.

THE COURT:  Thank you.

MR. CLOSE:  Your Honor, as you know, the Court knows we have a fully briefed motion to dismiss that lays out these arguments in greater detail.  But, first and foremost, we think

the pleadings are deficient insofar as they don't plead well -- any well-pled facts to show the existence of a false -- a materially false statement at the time it was made.

In our view, the pleading is very conclusory.  And, yes, there's not an intent element here, but there's still an obligation to plead facts showing a plausible claim here.  And that hasn't been alleged.

Moreover, there's substantial risk disclosures.  As the Court knows, in these cases, you know, the registration statement needs to be taken in its totality.

And as the judicially noticed documents that we put forth with the motion to dismiss set forth, Sonim did disclose key information about its -- the nature of its business, including that it did have the risk of undetectable and undetected software and hardware defects; that it was highly dependent on major players like AT&T and Verizon subsidizing and marketing its phones; that those channel partners were -- had the right to stop selling the phones if defects exceeded a certain level.

And we point out that the disclosure about defects exceeding certain thresholds necessarily acknowledges that there will be some level of defects.  I mean, this is a cell phone, after all.  And whether it's Apple or Samsung, we've all experienced the need for software updates and the need for glitches.

You know, so in our view the complaint is deficient.

There's no --

**THE COURT:**  Let me stop you for a second.

**MR. CLOSE:**  Yeah.

**THE COURT:**  Under *Iqbal*, *Twombly*, somebody has to plead their case, essentially.  Then when they get to summary judgment, they've got to prove it up with declarations.  And then they've got to prove it up at trial, if they get that far, with people.  It's all pretty much the same test at this point.

However, just because somebody hasn't filed a great complaint doesn't mean they don't have the information to go forward.  All right.

So the question I've really got here then is, aside from just challenging the complaint, all right, and going with what the defendant knows, let's say, about whatever's going on behind the scenes of the complaint, is it the defendant's position that they could make a credible showing that there was -- not just that the defendant didn't know, all right, that third parties were in charge of figuring out what was going on with the phones and whatever, because that apparently isn't a defense, at least for your client.  So the question -- or at least for Sonim.

So then we have the question, just, look, at the time that whatever was said at the time of the IPO and whatever other statements the plaintiff might be relying on at that time as an actuality was there a major problem?

**MR. CLOSE:**  No, Your Honor.  I mean, the phones were out there.  Not every phone was flawless.  We acknowledged, you know, that there were -- there had been a recall.  That's disclosed in the registration statement.

The phones were performing.  And there was a lot of -- and, you know, we gave to the plaintiffs, before any mediation, internal documents that substantiated this, that not every phone was out to market.

There was a pipeline of phones.  Some of those phones in the pipeline were still not 100 percent certified against Verizon and AT&T's requirements.  But the phones that were out there were selling and were performing, and there was a good track record and positive momentum behind the products.

**THE COURT:**  All right.  Thank you.

What about the negative causation defense, this idea that if the price of the stock went down, something else caused it?

**MR. CLOSE:**  Yes, Your Honor.  So this is on the face of the pleading itself, that the IPO was at $11, the stock then went up to almost, I think, 17, and then began to drift down in July and August to a low of almost $7.

And then the complaint alleges the truth was revealed, I believe, on September the 10th, and the whole bunch of actually well-pled facts about why they think the truth was revealed on September 10th.

At that point the stock was already almost 50 percent or

40 percent below the IPO price.  So just on the basis of the complaint allegations, all the stock drop prior to September 10th could not have been caused by the supposed false and misleading statements in the registration statement because there was no information in the market that would have revealed those falsities and caused the stock to drop.

So the case itself, as pled, assuming liability, assuming liability, would be the drop from 7 down to about 3 on that day, which is a very different, you know, damage population than 11 or 18 --

**THE COURT:**  All right.  So it goes to the level of damages that could be proved up.

Let me turn to Mr. Dolan for a second.  Although your client is not involved directly in this motion, if the settlement is approved, ultimately, your client will be out of the case without having to make a contribution to the settlement.

As Ms. Lenahan said, there are some differences, perhaps, between the manner in which your clients are situated versus Sonim.  Do you want to just describe a little bit why you feel that your client has a viable defense here, your clients?

**MR. DOLAN:**  Sure, Your Honor.

So, as Ms. Lenahan noted, the underwriters here have a due diligence defense.  It is an affirmative defense that we would bring forward if the case moved past a motion to dismiss.

It is really a process-oriented defense about the process through which the underwriters went about working through the IPO, both working with the company but also communicating with customers and suppliers of the company and verifying what -- what information was being told to the underwriters by the company and what was disclosed to the public.

So we -- we feel very strongly about that defense.  We would also bring at least in one expert on that defense.  It is something that the underwriters would stand behind and would pursue if this case goes forward.

And, similarly to Sonim, we also provided some documents, as part of the mediation, to the plaintiffs supporting that defense on a substantive basis.

Regarding the contribution, I'll just note that -- and it's in the papers, but the underwriters here, as is standard in these types of transactions, are indemnified by Sonim.

**THE COURT:**  Uh-huh.

**MR. DOLAN:**  And Sonim pays our defense and judgment costs here.

**THE COURT:**  Of course, that's not the plaintiff's concern.

**MR. DOLAN:**  Right.

**THE COURT:**  In other words, if the plaintiff had a decent case against your client, they can sue your client, get whatever joint and several or other liability award could be

made, and then you turn around and say, hey, Sonim, pick up the tab. But it's not the plaintiff's problem in the sense as long as there's money there, of course.

MR. DOLAN: Right.

THE COURT: Of course, if somebody didn't have any money, it's not worth going after them.

On the idea of a 6.3 percent estimate of total recovery and a 14 -- let's see. These were all very specific -- 14.9 percent. I guess the difference is a little bit then based on what Mr. Close has said about whether or not negative causation plays a role in this.

Is that correct, Ms. Lenahan?

MS. LENAHAN: Yes, Your Honor.

THE COURT: Okay. As far as how you came up with these numbers, which are, as I said, not just rounded up, they're off, there's some down, they're very specific, who made those calculations? Were they done by counsel? by some expert? Or -- you don't have to name names, but just getting some idea of the accuracy of this figure.

MS. LENAHAN: Certainly. We vetted these numbers with our damages consultant, which is Stanford Consulting Group. They serve as an expert in a lot of securities transactions. And they're the ones who estimated the class's damages, you know, with respect to the negative causation defense and with respect to the maximum possible damages.

**THE COURT:**  Okay.  All right.  A couple of things, too, bearing on the amount.

The plaintiff has set forth several reasons why they think the amount is fair beyond just making the calculations we were talking about.  First, the plaintiff felt that discovery would be time-consuming and expensive because these third parties are involved.

And could you elaborate on that a little bit, Ms. Lenahan?

**MS. LENAHAN:**  Certainly.  In this case we're aware that proving this case would involve dealing with, perhaps, AT&T and other carriers that carry Sonim's phones.  So we would anticipate having to, you know, subpoena them and serve various third-party discovery on them, which would be time-consuming, expensive.

And, you know, there's claims in this case involving the testing of the phones.  And we realize that would also involve third parties, more subpoenas.  So we just anticipate that would be an expensive and difficult process.

**THE COURT:**  Okay.  You mentioned AT&T, Sprint, and Verizon as being potential players in all this.

You also mentioned Sonim's financial situation, that they are in a precarious position at this time.  And you're satisfied that that is the case, I gather?

**MS. LENAHAN:**  Yes, Your Honor, we are.

**THE COURT:**  All right.  But that doesn't mean that,

for example, the underwriters or other people that have been sued in this action are similarly situated.

So did you feel, in not pursuing a settlement contribution from those defendants, that it would be a lot harder to make out a case against them than it was against Sonim?

**MS. LENAHAN:**  Well, with respect to the other defendants, in particular the underwriters, who, you know, I think would probably have the larger pockets, and the individual defendants, our concern here is that the underwriter defendants, because they are indemnified by Sonim, you know, they have -- they have not given any willingness to contribute anything to this litigation.

So we believe that in order to get any money from the underwriter defendants we would have to prove our claims, defeat their due diligence defenses, and then hope that Sonim remains solvent because it's footing the bill for the defense costs in the meantime.

**THE COURT:**  Is that really something that affects you? In other words, when you get a judgment against Mr. Dolan's client and they have money, the simple fact that they have an indemnification agreement not with your client but with Mr. Close's, how does that affect your ability to recover from Mr. Dolan's clients?

**MS. LENAHAN:**  Well, it would have an effect in terms of the amount of time taken to get to the point where the

underwriter defendants are found -- found liable and would have to pay a judgment.

And because Sonim is, in the meantime, defending the action, we may run into solvency issues with the company.  If there's bankruptcy, you know, we can be tangled up in that.  So it was a function of the time it would require and the likelihood of succeeding.

**THE COURT:**  Well, okay.  Not totally sure about that. All right.

Then you were comparing -- as the third reason, you were comparing the percentage of the hoped-for recovery to percentages of similar figures in other cases and pointing out that 6 percent is within the ballpark.

And, you know, are those cases similar to these that you were talking about?  In other words, how did you happen to pick those other than they came out similarly?

Are the facts similar in any way?  In other words, what makes them appropriate as comparators?

**MS. LENAHAN:**  So with respect to -- so one of the -- I think we cited three cases on that point.

One of the cases, *Redwen v. Sino Clean Energy*, that case was also a Securities Act case, and the settlement there was $2 million, and -- just like here.  And it had a $14 million maximum provable damages.  So that came to about 14.26 percent of the possible recovery.

And the Court there found that it was within the range of possible approval under the circumstances and noted that cases are frequently approved between 6.25 percent and 20 percent of possible damages.

THE COURT:  Well, that's one securities case with a -- you know, a substantially higher number than the 6.  So you're comparing it with whether there's a good defense on negative causation, which there may be in this case.

Are the other cases not even securities cases?

MS. LENAHAN:  I believe the other cases have 10(b).  They are securities cases, but they allege claims under the Exchange Act as well.

I do have -- if Your Honor would like, I do have some additional case cites I can give you.

THE COURT:  Well, you may want to give them later, in, perhaps, opposition to any objections, if they should be made at a later time.  I just wanted to get a feel for what you were using for cases.

Okay.  As far as the extent of discovery, because of the PSLRA, of course, there's a formal stay, that doesn't stop people from cooperating and exchanging information.  And apparently that happened here.

And you say that close to 3500 pages were provided to Sonim -- I'm sorry -- from Sonim to the plaintiffs along with documents from the underwriter defendants.  And it sounds like

you felt that you had, Ms. Lenahan, a pretty good picture of what evidence was out there that would both cut in favor of a judgment and against it.  Is that correct?

**MS. LENAHAN:**  Yes, Your Honor.

**THE COURT:**  Okay.  Was there something in particular that those documents, I guess, provided by way of information that led you to make the particular settlement you did?

In other words, did they support some of the arguments, perhaps, the defendants are making or things of that nature?

**MS. LENAHAN:**  Your Honor, these documents are subject to a confidentiality agreement currently.

**THE COURT:**  Okay.

**MS. LENAHAN:**  But I could say that, you know, it -- certainly, you know, at least with respect to the underwriters, we understand that there is a plausible due diligence defense there.

**THE COURT:**  Okay.  The notice that's given in connection with the -- you know, the motion that we have, certainly, it looks like -- let me just ask you.

Do you just have the names of people who are actually holding the shares themselves and then relying on, for example, brokers to send the notice forward or to provide those names to the administrator so that those people can be notified?

Is that kind of how this is working?

**MS. LENAHAN:**  Yes, Your Honor.  Sonim is -- pursuant

to the settlement agreement, Sonim is to provide us with, you know, records of the record holders. And then from there -- most likely, a lot of those are brokers. And then from there, they would provide the claims administrator with information.

**THE COURT:** Okay. This is a class, as I understand it, where the members can be identified by whatever the most current mailing address is for those individuals or entities. Is that correct?

**MS. LENAHAN:** Yes. I mean, certainly, you know, notice is likely to be over-inclusive in that, you know, some people notified will not be members of the class because they weren't damaged or they didn't buy precisely within the correct window.

**THE COURT:** Well, but in terms of what kinds of notice has to be sent out, in recent times there have been cases that have been decided, one in particular that comes to my mind that started in this district, not with me but with a judge who I would describe as very careful in approving settlements, and a number of different kinds of notices were sent or used in that case.

And the Ninth Circuit said, oh, well, you got a pretty big return where nobody could figure out where these people were and so you should have done more. And they didn't like the idea that just one form of notice was given.

Now, that was a case where the class members would have

been harder to keep track of, shall we say, and somewhat transient.  That isn't, I think, what we're seeing here.

In the same light, is there some reason not to use email addresses?  Don't most people who have people of record as either being customers, clients, or somehow of interest to them, don't they usually have email addresses for the very reason that people tend to hang on to those and it's easy to get in touch with people that way?

So my first question is, are email addresses readily available for this class or not?

**MS. LENAHAN:**  Not to my knowledge.  It's possible that the brokers have the email addresses of their clients, and in providing the information to the claims administrator they might pass along the email addresses.

But here we do have a settlement website where, certainly, potential class members can communicate with the claims administrator through email and, you know, that way they can have -- they can, you know, receive the proof of claim form and other information.

**THE COURT:**  That wasn't really my thought.  My thought was getting in touch with them in the first instance.

Let's say that the broker's got an address that's not good anymore and, as a result, the letter comes back or the notice comes back.  All right?  It would be appropriate, it seems to me, if the claims administrator had an email address that they

should then follow up with that.

And I'm wondering what provisions are being made here to follow up if you get a return on a mailed notice.  Are you going to just drop it in the wastebasket?

**MS. LENAHAN:**  If notice is returned?

**THE COURT:**  Yes.

**MS. LENAHAN:**  My apologies.  If the notice is returned to sender, it goes back to the claims administrator.  My understanding is that the claims administrator uses a mail -- a service that basically notifies a change of address.  So my understanding is that they update the database to find out, you know, if that person has a new mailing address.

But with respect to emails, I'm not exactly sure how that process would work.

**THE COURT:**  Well, I'm thinking there may need to be some provision that if the broker either has an email address or has given that email address and mailing address to the administrator -- in other words, they should give the full information they have to the administrator.  And if the letter comes back, then I would think that there should be a provision to follow up with an emailed notice, if one has it, not just go through some, you know, huge address search only and maybe find out that they run into, you know, a blank wall there.

The more people you have responding, the more chance you have of getting this settlement approved.  If a whole bunch of

stuff comes back, it's going to be less favorable.

So I understand, also, you're going to publish, but, you know, I don't know how many investors actually read those publications.  It's fine to do it, but it seems to me that just in terms of getting ahold of these people, and then in some instances, let's say the letter goes out, it doesn't come back, and you never hear from these people.

Now, it may be that they just say this is a big pain in the neck and it's too much work and I'm not going to do it and it's not enough money.  Or maybe they've just sort of put it aside and figured they'd get back to it as they're given, you know, enough time to look it over, and they forget.

And in some instances, when no response has been made, the claims administrator will send out a reminder.  There's no provision in this settlement for that either.

So I was wondering, in previous settlements that you've had, what kind of success you've had with just, I'll say, the bare bones aspect of just sending out letters to people and posting something where people may or may not look at it.

**MS. LENAHAN:**  My apologies.  I'm just looking for my relevant information here.

**THE COURT:**  Yeah.  Well, Mr. Gonnello may have something too.  If he does, he's welcome to chime in.

**MR. GONNELLO:**  One of the things I was thinking, Your Honor, I mean, we haven't done that before with the email

address, but I think it's something that we could add to the notice provision such that, you know, we could work it out with the administrator and add some language to the notice, because I don't think it would be particularly expensive to do that. It seems like a reasonable course of action such that we should be able to do that, I think.

**THE COURT:** Okay. I can see why you don't want to go through too many different processes if they're not necessary, because the settlement isn't that big. And if you start chipping away at it here and there with more costs that it starts to reduce what's available to the class members and has something of a, you know, cyclical effect here.

So I would ask you to consider that. And the notice is probably going to have to be done over, to a certain extent, in any event, and so that's something that I would ask you to explore. And unless it's not possible at all, at which point you would have to let me know why it's not possible, but not feasible and practicable, that you include that as part of what the claims administrator is going to be doing, so to speak, wherever that fits in here.

Let me just see here. Okay.

Can we just talk about the reimbursement of nominees, custodians, that idea? Is this by statute or case authority or what? You say they are entitled to be reimbursed for the expenses they incur in notifying class members.

Ms. Lenahan, do you know where that comes from?

**MS. LENAHAN:** Yes. So I don't have the specific citations with me, unfortunately, but I do know that they are -- they are entitled to be reimbursed.

We usually put in a -- a cap. And I, fortunately, have never had an issue with any broker fighting over the amount that we're allowing for reimbursement. And the reason is just, you know, to prevent costs from getting out of control.

**THE COURT:** Do you have any idea what one might expect as far as a claim here by nominees, custodians, brokers?

**MS. LENAHAN:** It can be quite large, depending on how many notices they send out. So, you know, it would really depend on whether the broker sends out the notice themselves or not. But, you know, I've seen it in cases where more notices go out, I've certainly seen it be in the, you know, $10,000 range. But it really depends on, you know, the -- how many claims go out ultimately.

**THE COURT:** Any idea how many brokers are going to be involved in this process?

**MS. LENAHAN:** I'm not aware of the number of brokers. We had a recent case where, I would say, about 30 brokers were involved. I don't have the numbers in front of me in terms of how much it cost, but I think it was fairly substantial. I think it was about $15,000.

**THE COURT:** Okay. And what you propose doing is

essentially negotiating with these people off the record, so to speak?

**MS. LENAHAN:** Uhm, well, right. What we -- we do is we say, you know, if you're going to send out the -- my apologies. I just need to find the correct page here.

If they're going to send out the notice themselves, they get 70 cents per unit. And if they're just going to send addresses to a claims administrator, they get 10 cents a unit. I've never had an issue with that in the past. That's numbers that we typically use.

**THE COURT:** What are you looking at? In other words, where are you getting those figures from right now?

**MS. LENAHAN:** Those figures are from several past settlements we've done.

**THE COURT:** Oh, okay. But not in the documents that I actually have here.

**MS. LENAHAN:** Oh. Well, it's in the -- we put it in the proposed order.

**THE COURT:** Oh, okay. I'll double-check that. I was going over the order earlier, so I'll take a look for that.

In the meantime, let's keep going. Okay. So, in fact, then it becomes a matter of formal order, and that makes me feel better about that. Okay.

About this termination threshold idea, you're letting the class know in the notice that there is this agreement that, you

know, if enough people don't participate in this class, if too many of them opt out, in effect, then the settlement is off.

And these are not uncommon agreements. Ordinarily, they're part of the main settlement. In this instance, there's a separate agreement. And you cite to a case that Judge Tigar decided where -- where, you know, he looked at the particular sections under Rule 23 and decided as long as the Court takes a look at the separate agreement and decides it's fair and reasonable, that it doesn't have to be made part of the main agreement or disclosed.

I'm just curious, is there a reason that you wanted to keep it all essentially under wraps?

**MS. LENAHAN:** The reason here is that if the termination threshold is made public, we run the risk of, you know, people grouping up, trying to opt out of the class in order to negotiate special treatment; basically, trying to get more money for themselves.

**THE COURT:** All right. That may be more common in a case like this where you have more, perhaps, sophisticated class members or whatever. All right.

When we get to a point where -- that agreement, let's just see for a moment. I don't think I know what the terms of it are. And in order to review it, I'm going to ask that it be filed under seal because I will have to look at it even if the class doesn't have to look at it.

All right.  Moving along here at a little more rapid clip, the *cy près* aspect seems fine.  The recipient looks fine.  No problem there.

The plan of allocation is all very involved, and I gather that it makes some sense to all of you.  Some of -- some of these figures are essentially by statute as one of the options for how you can calculate a loss.

There are people who are going to be deemed not to have suffered any loss at all, and those people are people who sold prior to September 10.  And you've decided that they didn't suffer a loss because they predate the disclosure.

Is that what you're thinking?

**MS. LENAHAN:**  Yes, that's correct.

**THE COURT:**  Okay.  Did you ever have a case without a disclosure?  It just turns out that sort of out there in the world people know that the product isn't very good and stop buying it?

**MS. LENAHAN:**  Uhm, you know, I'm not --

(Laughter)

**MS. LENAHAN:**  Not to my -- not to my knowledge.  But it's possible that it exists.

**THE COURT:**  Okay. All right.  Let's see.  Just looking here.

For a lot of people, irrespective of what they bought for and they sold for, they're going to end up with $3.26 a share.

And I understand where that's coming from.  It's, you know, the bottom line here at the time.

But why -- why would that be their loss?  Or why did you decide that would be their loss even if the differential is greater?

**MS. LENAHAN:**  That is a product of the fact that our complaint pleads a corrected disclosure of that drop on September 10th.  And, you know, we think that in this case, in consultation with our damages consultant, that reflects the negative causation defense as the most reasonable amount.

**THE COURT:**  I see.  Okay.  I see, then.

So you've picked a figure, basically, recognizing that there could be other bases for the drop between when they bought and when they sold.  Okay.  All right.  Then rather than just pick a number out of the air, you picked -- okay.  All right.  I just wasn't sure where it was coming from.  All right.

Now, let's talk a little bit about the schedule.  You have a schedule set out in relative dates.  And some of these dates I would want to change and to indicate why.

Okay.  One thing, and this may have just come out in the way you were calculating things, but I think the deadline to do whatever people are going to do should -- those deadlines should all be one deadline.

So whether you're going to object, opt out, submit a claim

form, just give them one date.  And so I'll talk to you about it.  I've got some proposed dates here.  You don't have to do that right now.  I'm just explaining why I intend to combine those.

Then I think there should be a split, all right.  One I'm putting together, this one I want to take apart; and that is the motion for fees and for final approval.

I think the fees motion has to come in a lot earlier because it goes to people's objections and what they think about the settlement.  The fees aren't just some separate idea here.  They bear on what the rest of the class is going to get. So that I intend to split up.  And I'll give you dates on that.

The -- let's see.  The deadline to respond to objections, I think I would make that part of the same date I give you for final approval, which is going to be different than the motion for fees.  And the final approval hearing I'll also get moved slightly, to a Friday.

Okay.  So here is the schedule that I'm suggesting.  The first thing is -- well, I'll just give you the dates.  And, then, make a note of these because if we go with these dates these are what I want you to put in the notice rather than have the notice have stage directions or relative, you know, dates based on somebody counting something up.  Just want to give them a date.

The order I can fix up myself, but the notice you're going

to have to do at your end and then resubmit.

Okay.  So the first date I've got here would be the date for -- is it Sonim or Sonim?  I've gotten two different pronunciations from counsel.

**MR. CLOSE:**  Sonim.

**THE COURT:**  Sonim.  All right.  I was saying Sonim.  Mr. Close said Sonim.  It's his client, so I went to Sonim, and I guess that's what I'm going to use.

All right.  So the date for Sonim to give lead counsel the class list so they can start moving with that is November 20.

Then the notice to go out by the claims administrator and notice to be mailed to the class by December 4.

On that same date, because the two different entities are doing these things, December 4, that would be the deadline for the plaintiff to file their motion for fees, expenses, and the incentive award.

Now, that's -- yeah, that's about a month earlier than you were asking for, but you should have time to do that.  If you needed more time, I can give you more time, but that will be by December 4.

And that's about, at this point, about a month off from now.  A little more than a month off.  So be thinking about that as I go through these other dates.

December 18, that's the notice to be published in the two financial publications.

February 3 would be the deadline to object or opt out, and that same date to submit a claim form.

Then February 17, the deadline to file the motion for final approval, that's just a couple of weeks after the objections would be due.  If that's not enough time, when I get through with these dates, let me know.  Again, an adjustment can be made if you need more time.

It's all that you had asked for.  And knowing that you might want to get this thing moving along as quickly as possible, I chose that same relative spread in time.

Then February 17 would be the deadline to file the proof of mailing and those kinds of things.  That's coming, I think, from the administrator.

And then the final approval hearing would be March 5.  So that would be essentially two weeks after the deadline to file the motion for final approval, a couple of days past it to go from a Wednesday to a Friday.

So let's take up just quickly the two dates in particular that I asked you about.

Can you work with a December 4 date to file the motion for fees, Ms. Lenahan?

**MS. LENAHAN:**  I think that should be fine, Your Honor.

**THE COURT:**  Okay.  And then the other, again, is do you have enough time to file the motion for final approval?  It would be two weeks from the last objection or opt-out or what

have you.

**MS. LENAHAN:**  I believe that should be fine.

**THE COURT:**  Okay.  It's what you used in the sense of your own relative schedule, but I didn't want to shortchange you if you thought you needed more time.  Okay.  And then the hearing would be at 9 o'clock.

And I think we should say -- because we really don't know now, we shouldn't say how it's going to be conducted, all right.  At least for the moment we'll intend it's in person.  But if it turns out that we're still operating under COVID-19 restrictions, then a notice would be put -- you know, we'd notify counsel and, of course, put a notice in the docket, because this type of hearing is a public hearing and there may be other people who want to be present and that way they would know that they could tune in.  You understand that.  So, yeah.

Okay.  Now let's go to the forms.  And there are two forms; a short form that would be used for the publications and a much longer form that would be sent to the class members.

Let me get those in front of me.

Somebody at your end -- and I assume it's going to be at the plaintiff's end -- will need to make these notations, so I want to make sure you've got something that you can work with to do this.

Have you got a printed-out copy?  Because just making changes on the electronic copy at a certain point is going to

be difficult for you.  So I'm wondering.

**MS. LENAHAN:**  I have a printed-out copy.

**THE COURT:**  Great.  Okay.  Let's go to the short form.  Tell me when you have it in front of you, Ms. Lenahan and Mr. Gonnello and Mr. Close and Mr. Dolan.  I think it would be a good idea for you to follow along whether you have a printout or not, because I may be asking you some questions also about changes I propose to make.

Are we all set?  Everybody okay?  Ready to roll?

Okay.  All right.  On the short form, be sure to put in information for the blanks.  And I'm just calling them to your attention now.  You may want to highlight them on your printed form just so you know.

Sort of dead center on that first page is the blank for the date of the hearing and time.

Okay.  Now, I want no part of any of these notices in the sense of my being identified in them.  So please strike, "Before the Honorable Maxine M. Chesney."  That comes right after the date and time of the hearing.  Okay.

Then we have in that same paragraph -- I want to ask you about interest because I was wondering if we should put that in or whether -- because, ordinarily, it wouldn't even be an item in this kind of a case, whether it really is necessary to mention it at all.

You have not mentioned it anywhere along the way.  In

other words, you say, all right, we're going to ask for 25 percent of the fund, and then there's these expenses.  Okay.  Usually, as I say, I don't know that anyone is really asking for interest.  And so I don't think it's going to change anything at the moment.

At the moment I don't think you have to put it in, okay, now that you've explained how it works.  Okay.  It's really money that is going to be earned on top of whatever everybody is getting, and it's not -- it may confuse things.

Okay.  Then on page 3 -- well, on page 2, just kind of alert yourself that there are two blanks on that page for dates that you will need to fit -- fill in according to the schedule that I gave you.

And do you have those dates, Ms. Lenahan?  Are you satisfied you have them all?  If you don't, I'll read them again afterwards.

**MS. LENAHAN:**  I believe that -- I believe I have all of the dates, but perhaps at the end we may just want to confirm.

**THE COURT:**  That's great.  Just remind me.  Read back what you have at that time.  I'll run it, you know, against the list I have.  I'll go back to that and we'll make sure everybody is on the same page.

**MS. LENAHAN:**  Thank you.

**THE COURT:**  Okay.  These are pretty clear, but

sometimes it's easier to take a, you know, Sharpie and mark it in yellow or green or red or something.

Okay. On page 3, the first full paragraph -- let's see. I'm not sure -- let's see. If we are going to give them the option of filing their objections in person -- oh, there's a box in the lobby, I think.

I'm just wondering -- and it says any location in the U.S. district -- in this district, United States District Court in the Northern District. I think we have a local rule. I don't know if it affects that. If it does, they would have to drop it in person at 450 Golden Gate Avenue.

We've got a local rule that says, for papers that are going to be filed in connection with this kind of a case they have to be filed in the district in which the case is being -- in the division, if you will, division of the district, in the division in which the case is being heard.

We have three divisions, and San Jose and Oakland don't want our papers, okay. So it's going to go here. So you would have to change that. And it may be okay to say it. I doubt if anybody is going to be in the neighborhood, but they might be. So you would have to change that to, you know, the U.S. District Court for the Northern District at 450 Golden Gate Avenue San Francisco. Okay.

And the Zip code, you know. Oh, we need -- yeah, we have the Zip code. Okay. And our Zip code is the same as at 450,

so, fine.

Oh, yes, where is this on page 3?  Where am I seeing this?  Oh, don't put "By order of the Court."  Just take that out, and -- but there's someplace, I thought, here where you referred to a clerk by -- I think it says "class action clerk," and we actually don't have one.  Some districts do.

Oh, yes, okay.  Let me point out where this is.  I neglected to highlight it.  Mostly I've been highlighting.

That's at -- the second line of the first full paragraph says the word "Class" at the end and runs over to the third line "class action clerk."  That should be changed to "Clerk of Court."

**MS. LENAHAN:**  Okay.

**THE COURT:**  Okay.  All right.  Thank you.

And then we were getting rid of "by order of the Court," so that takes care of that.  That was not a big deal.

Okay.  All right.  Hang in there.  We're going to keep going.  Now we're on the long form, so I want to give you a chance to get that.

Let's see how we're doing on time.  Whoa, time is passing quickly.

Okay.  Have you got the long form now, Ms. Lenahan?

**MS. LENAHAN:**  Yes.

**THE COURT:**  Okay.  First thing is I do not think that ordinarily we have, for a notice, the title of the case, the

Court, the number, all of that.  I think we just have it starting with the notice.

And it seems to me that you should take out "U.S. District Court," the title of the case, the number, class action, and then it just says "Notice of Pendency and Proposed Settlement of Class Action" up at the top.

Now, there are a lot of things that I do want to go over with you.  I actually have to sort of switch glasses at some point, I think.

Let's see.  Oh, you will see, on page 1, the first bullet, that it refers to "investors."  But there is only one lead plaintiff and named plaintiff here, and I think you should say "an investor who alleges."  Okay.

Then there's a blank.  You want to just make sure you remember there's a blank there in the second bullet.  The -- then I'm going to go, let's see, to page 2.

The first two bullets don't make any reference to interest.  But, again, I was going to have you add something, but now I think it's not necessary after you've explained what you did.  So, okay.  All right.

Then, let's see.  Page 2.  Okay.  The fourth of the options, go to a hearing on -- ask to speak in court about the settlement at the settlement hearing.

All right.  There's a possibility that we won't be in court, but I guess it's okay to leave it as it is.  In effect,

we're in court now, sort of virtual court.  So I think it's okay.  We will always let them know about the other late-in-the-game changes.

The last bullet on that page, at the end of the sentence says "After appeals are resolved."  All right.  It sounds like you're just anticipating we're going to have appeals and not just one.

So I think maybe you might write, instead of that, on a more optimistic note "any appeal is resolved."  I.e., if there is an appeal, you know, any appeal is resolved.  It's a very minor point, but it sounds a little less onerous.  Okay.

All right.  Page 3 now.  Okay.  Let's see.  Yeah.  You will see in the section that is headed up "Statement of Potential Outcome of the Case," there are two full paragraphs and then one that keeps going.

In the second full paragraph, you have the phrase "*inter alia*."  Okay.  Maybe these aren't people buying, you know, Cracker Jacks, but still I think we should stay away from the legal terms.  And I was thinking of just substituting, you know, an English translation, i.e., "among other things," but it struck me you've covered everything.

You've covered the idea of liability right before it, now you're going into the damage area.  Why do you need *inter alia* at all?

Let me point where it is.  Six lines down, about

two-thirds of the way over.  It's in italics.

**MS. LENAHAN:**  Oh, I see.  The defendants might have an idea with respect to that.

**THE COURT:**  Mr. Close?  Mr. Dolan?  Anyone want to weigh in on that?

**MR. CLOSE:**  It should be stricken, Your Honor.

**THE COURT:**  Don't like *inter alia*.  Okay.  Fine.

Okay.  And then, just for consistency, at the -- in that same paragraph, the second-to-last line, it's actually the last full line, the word "Settlement" is there over toward the right-hand part of that line.  And you've been capitalizing it and make it a capital.  Okay.  Okay.  Just to be consistent.

Now let's go to page 4.  Let's see.  Again, I was concerned about interest, but we can forget that part.

And then, getting further down in the page, "Why did I get this notice?"  I would say instead of "The Court caused this notice to be sent," I would suggest that we go more in the passive tense.

So if you struck "The Court caused" make a capital T on "This" and instead of "to be" change it to "is being," you would have "This notice is being sent to people" as opposed to "The Court caused."  All right.  All right.  "This notice is being sent to people who may have purchased or otherwise acquired Sonim common stock," et cetera.

Then the next sentence starts kind of the same way, and I

would modify it in the same way.  "This notice is being sent out because" as opposed to "The Court caused the notice to be sent out."

Okay.  Then we'll go over to page 5 when you're ready.  Ready?

**MS. LENAHAN:**  Yes.

**THE COURT:**  Okay.  On page 5, in the last paragraph, you have a past tense in the third line of the last paragraph.  It says, "The Amended Complaint generally alleged."  I would change that to present tense, "alleges."  The case is still going on.  Okay.

Now, now we're going to get to the more involved changes.  We may get back to some little ones after, but we're getting to some more involved.

My thought is this section, number 3, ends there, okay.

Now comes this whole long dissertation that sounds like you're trying to ward off objectors.  And, frankly, it's a big argument that can be made as necessary in the motion for fees about how much time you put in and why this isn't a slipshod, carefree idea but something that you really knocked yourselves out to arrive at.  But we can't be having notices of this nature with all this -- this language.

So there are certain concepts there that, frankly, actually, go how and when was the settlement reached?  And it seems to me that we ought to just redo the section so that we

just, you know, essentially get rid of paragraphs 1, 2, and 3 on page 6, and then the paragraphs that come under Section 4, and come up with something short and snappy that gets your point across as follows.

And I can read this to you, and you can see what you think.  I want to cover that there was a motion to dismiss, okay, so that there was -- you know, there was a real challenge.

And then before the motion was heard, you went to a mediation.  And I'm sure Elizabeth Laporte, Magistrate Judge Laporte, retired from this district, would be very pleased to see her described as you have her, but we're just not going to get into personalities here.

And, ultimately, what I want to do is say that, you know, you executed a settlement after you went to a mediation and you had further negotiations, and then you had this confidential -- or you had this separate agreement so that that's where you want to put it in.

Now, I'm going to read you -- I'm going to read you how it would read, and then if we stay with this -- unless we, you know, flesh it out much in any way.  If we stay with it, I'll tell you how you can use what you've got and just start striking a lot of words here and there.

Okay.  So just sort of listen along.  There's no point in really reading what you've got because it's hardly tracking it.

All right.  "On April 1, 2020, the Sonim defendants filed a motion to dismiss the amended complaint in which motion the underwriter defendants joined.  On May 1, 2020, lead plaintiff filed opposition, to which the Sonim defendants replied.  Prior to any ruling on the motion, the parties met for a mediation on June 24, 2020, before a private mediator, and after further negotiations, on dates subsequent to the mediation session, concluded the stipulation on September 10, 2020."

Then, in that same paragraph:  "Simultaneously with the stipulation, lead plaintiff and Sonim also executed a confidential supplemental agreement," which then I would just take everything you said through the word "criteria" and get rid of the part about during the documentation you reached an impasse and whatever-whatever.

Okay.  So I'm trying to get across you went to mediation, there was a motion, the defendants joined.  You know, it wasn't just one defendant, but other people made that motion too. They ganged up on the plaintiff.  Then everybody went to mediation and after a fair amount of effort you worked it out.

And then the rest of the stuff, if you want to use it to beef up your response to any objections that are made or to add in your motion just as a preemptive strike, everything that you think is important there, but I don't think we can argue the matter in the notice.  It's not really what it's designed to do.

If you can live with that, I'll tell you how to do it with, you know, some amount of ease.

MS. LENAHAN:  I think that makes total sense, Your Honor.

THE COURT:  Okay.  Then let's you and I take a look here.  And we're going to start with -- and keep in mind all this is going to be airlifted to the place where we've stricken everything under how and when was the settlement reached.

So item 3 is what we've talked about ending on page 5. Then when we get to page 6, we're going to rewrite what's there and move it to under how and when the settlement was reached, and what's there now goes away.  Okay.

MS. LENAHAN:  Okay.

THE COURT:  So some of this can be used.  And you may as well just -- it's easier than you having to write it out by hand.

"On April 1, 2020, the Sonim defendants filed" -- now change "the" to "a," okay, because this is the first time we're talking about it -- "a motion to dismiss the amended complaint." Put a comma under "complaint," and then strike the balance of that sentence and insert after the comma "in which motion."

All right.  Tell me when you've done that.

MS. LENAHAN:  Yes, I put that in.

THE COURT:  Okay.  Then change the capital T before

"the underwriter defendants" to a lower case T.  And continue to the word "joined," at which point put a period and strike every -- put a period after "joined" and then strike the balance of the sentence.  So that we will pick up again with the words "On May 1, 2020."

**MS. LENAHAN:**  Okay.

**THE COURT:**  All right.  "On May 1, 2020, lead plaintiff filed," and then you can just take out "his opposition" and just put "opposition."  And then put a comma after the word "opposition" and strike everything after that, let's see, up to the words "which the Court converted."  Okay. I'm not going to be using conversion, but I'm keeping a couple of words there.  Okay.

So after putting a comma after "opposition," you keep striking, striking, striking.  And you will ultimately get to the words "which the Court converted."  Do you see those?

**MS. LENAHAN:**  Yes.

**THE COURT:**  Put the word "to" before the word "which" -- oh, okay.  We have that.

**MS. LENAHAN:**  Yes.

**THE COURT:**  Say "okay" or something so I know I can keep going.

**MS. LENAHAN:**  My apologies.  Yes, that is in there "to which the Court converted."

**THE COURT:**  Well, then you take that whole phrase out.

And so you remove everything after the word "which" until you get to the word "the Sonim defendants," which is in the line below.  Do you see that?

MS. LENAHAN:  Oh, okay, yes.

THE COURT:  Then you just get -- get rid of "filed" and just put "replied."

MS. LENAHAN:  Okay.

THE COURT:  Period.  And then you strike the rest of that.

MS. LENAHAN:  Okay.

THE COURT:  Do you want to try reading it back?

MS. LENAHAN:  Certainly.

THE COURT:  Okay.

MS. LENAHAN:  Would you like me to start from the beginning here?

THE COURT:  On April 1.

MS. LENAHAN:  "On April 1, 2020, the Sonim defendants filed a motion to dismiss the amended complaint in which motion the underwriter defenders joined."

THE COURT:  Defendants, yeah, joined.

MS. LENAHAN:  "On May 1st, 2020, lead plaintiff filed opposition, to which the Sonim defendants replied."

THE COURT:  Great.  Okay.

New -- I don't know if we need a new paragraph or not.  I will leave that editing to you.  It may be fine to start a new

paragraph here.  All right.

Now, this one is going to go as follows.  Strike -- that paragraph starts "Following."  Okay.  Strike everything starting with "following" through the word "notice" on the second line of that paragraph.  And I'm going to give you just a phrase to substitute for that intro.  Okay?

**MS. LENAHAN:**  Okay.

**THE COURT:**  All right.  Here's the phrase:  "Prior to any ruling on the Motion," and you may want to capitalize the M on that, and then put a comma after the word "Motion."

**MS. LENAHAN:**  Okay.

**THE COURT:**  Now you pick up with the word "the parties."

**MS. LENAHAN:**  Yes.

**THE COURT:**  And I guess we have the date -- let's see. "The parties met for a" -- I don't think we have to tell them it's virtual.  Just say "mediation."

**MS. LENAHAN:**  Okay.

**THE COURT:**  Now, you have on "June 24, 2020" -- I guess, per the grammar books and whatever, you should have a comma after 2020.  And then, now, you have the word "before," and then I would just say "a private mediator."

So let's see how much can you use on that.  You would take out Judge Laporte's name and before the word "mediator" put "a private," and then keep the word "mediator."

MS. LENAHAN:  Okay.

THE COURT:  Then you put a comma, and then -- okay. And then just strike all of the lines after that until you get to -- oh, my gosh -- the word -- the words "the mediation session," which are the words that start the line that is four lines from the bottom of that paragraph.

Okay.  Have you found "the mediation session"?

MS. LENAHAN:  Yes.

THE COURT:  Strike everything after we said "before a private mediator."

MS. LENAHAN:  Okay.

THE COURT:  You know, you have "before a private mediator," comma, and then everything goes out until you get to "the mediation session," and then I'm going to add something before that.  Okay.

MS. LENAHAN:  Okay.

THE COURT:  All right.  So if you'll go back up to the start of that paragraph, in line 3, where you have the word "mediator" and a comma after it, and then put "and."  And I guess it should be another comma.  "And," comma, "after further negotiations on dates" -- I had you strike "subsequent to," but actually I'm keeping that, "on dates subsequent to the mediation session."  Sorry, I over-scratched out.

MS. LENAHAN:  Not a problem.

THE COURT:  You would have to change the capital to a

lower case.  I tried to save as many words as I could, but it didn't turn out to be very -- okay.

"And after further negotiations on dates subsequent to the mediation session," now there's a comma, then take everything out until you get to the words "the stipulation," which is the end of the second-to-last line over to the last line of that particular paragraph.  And then you'd put the word "executed" before the words "the stipulation."

**MS. LENAHAN:**  Okay.

**THE COURT:**  Change "dated as of" to "on" September 10, 2020, and put a period.

**MS. LENAHAN:**  Okay.

**THE COURT:**  Now, I don't know if you want to emphasize, as you are at the moment, this agreement they're never going to get to see.  So you might want to bring that paragraph up because you're not going to have a gigantically long paragraph before it.

And there you really just keep the first sentence of that paragraph.  I would -- I think it makes it a little clearer to write the word "also" before the word "executed" in that first line in that paragraph.  "Simultaneously with the stipulation lead plaintiff and Sonim also executed."

**MS. LENAHAN:**  Oh, yes.

**THE COURT:**  Okay.  And then just strike the last sentence.  So it's kind of a long sentence, but it's a short

thing it would tack on to and doesn't make such a big deal out of it.  And I think it probably belongs at the end as part of the discussion of what you did.  Okay.

MS. LENAHAN:  Absolutely.

THE COURT:  If you want to take a stab at that and read it back -- that was a lot more scattered -- you can give it a try.

MS. LENAHAN:  Sure.  So I'm starting with the second paragraph on page 6.

THE COURT:  Correct.

MS. LENAHAN:  So, "Prior to any ruling on the motions, the parties met for a mediation on June 24th, 2020, before a private mediator, and after further negotiations on dates subsequent to the mediation session" --

THE COURT:  Way down.

MS. LENAHAN:  Oh, goodness.

THE COURT:  "Executed."

MS. LENAHAN:  -- "executed a stipulation on September 10th, 2020."

THE COURT:  "The" stipulation is fine.

MS. LENAHAN:  Oh, I see.

THE COURT:  It is "the stipulation" we've been talking about.  Okay.

MS. LENAHAN:  Okay.  Thank you.

THE COURT:  Just the way you have it.  "Executed," and

then you had the words "the stipulation." And you had the date, which I just changed from "dated as of" to "on" and put a period.

MS. LENAHAN: I see. Okay.

THE COURT: Is that okay? Then you're going to move up the other one to just put "also before executed" and get rid of the last sentence.

MS. LENAHAN: Yes, that -- that I have in here.

THE COURT: Great. Okay. All right. That -- that is the new form. All right. The new 3 is most of the old 3.

Now, where am I? Okay. Okay. I think I can get quite a bit past.

All right. So, now heaving a sigh of relief, you now go to page 8. Okay. All right. Let's see what I have on 8. That was the big change. 5 and 6 was the big change primarily.

Oh, I just want to call to your attention, if you would look at that short paragraph under item 8, the second one, you make a reference to certain pages in the notice. That may likely change. If it does, just make a note to yourself that you have to confirm that those pages are still correct. They may well not be. Okay.

MS. LENAHAN: Yes. Thank you, Your Honor.

THE COURT: Okay. That's 8. Oh, and one other one. I think this has to do with the last paragraph in Section 9. Give me a second here.

Yeah, it has to do with telling people, essentially, we don't know what's going to happen on appeal, it could take a long time, and don't start hounding us, you have to be patient. Okay.  I would change that sentence slightly.  So I'm talking about what would be the third sentence in the last paragraph under 9.  It starts, "It is always uncertain."

You got it?

**MS. LENAHAN:**  Okay.

**THE COURT:**  All right.  Let me read this to you and see what you think, and then if it's okay, we'll go back and you'll make that.  Okay?

All right.  Instead of, "It's always uncertain whether appeals can be resolved," that's not saying much for the Ninth Circuit, okay.  So I think I would -- I might say "how and when these appeals ultimately will be resolved" and then go on from there.  What do you think?

**MS. LENAHAN:**  I think that makes sense, Your Honor.

**THE COURT:**  All right.  So "whether" changed to "how and when."  Now it says "these appeals," and then instead of "can be," you'd say "ultimately will be."  Okay.

**MS. LENAHAN:**  Okay.

**THE COURT:**  "Ultimately will" goes in.

**MS. LENAHAN:**  Okay.

**THE COURT:**  All right.  "It's always uncertain how and when these appeals ultimately will be resolved."  So it gives

them an idea, you know, it's going to take a while and doesn't say that nobody's ever going to do anything with it.

Okay.  10.  Oh, yes.  Now, where is that?  On page 10 -- oh, yes, I don't want to say this to people.  All right.  The last sentence on page 10 says, "Please note, if you decide to exclude yourself, there's a risk any lawsuit you file may be dismissed."

It sounds like -- it almost sounds like it could get dismissed because they didn't really exclude themselves properly or something.  You know, if all you're trying to tell them is they may lose, I don't think you should say that.  I think that should be stricken.  Okay.  So just get rid of that part.

**MS. LENAHAN:**  Is that everything, that sentence beginning with "Please note"?

**THE COURT:**  Yeah.  Just out it goes.

Okay.  Let's see.  11, just make a note to yourself that there's a -- what I'll call a stage direction in the first paragraph.

I don't -- in the seventh line over toward the left, it's got a bracketed date of notice.  You have to, you know, fix that.  And you might not pick it up visually.

And then after that, there are two large blanks that you have, one in that paragraph and one in number 12.  Okay.  One in 11 and one in 12.

**MS. LENAHAN:**  Oh, yeah.

**THE COURT:**  And then let's go over to page 12.  Small things.  Let's see here.  Because we're giving them some options.  Yeah, okay.

You will see in that last paragraph that starts "Your objection," do you see that on page 12?  Way, way, way down.

**MS. LENAHAN:**  Oh, yeah.

**THE COURT:**  Several lines up from the bottom, "Your objection."  In that next line, it says, "class action clerk." Could you change that again to "Clerk of Court."

**MS. LENAHAN:**  Yes.

**THE COURT:**  And let's assume we're going to let the people file in person.  But if they do, you need to change that phrase that's over on page 13 to make clear by filing in person -- I guess you could say at that same location or something like it, you know, some phrase that lets them know it's at the same place.

**MS. LENAHAN:**  I understand.

**THE COURT:**  Okay.  And then you'll see you've got a blank there right before number 16.  And in 17, you have three blanks that you need to fill in.

**MS. LENAHAN:**  Yes.

**THE COURT:**  Okay.  One second.  See, they can only use that drop box where we're located.

Just for your own reference, if you're curious, I did make

a note here.  It's -- Civil Local Rule 5-4(a)(3) is the rule that says that if you're going to drop stuff off, you've got to drop it off in --

MS. LENAHAN:  Oh, I see.  Thank you, Your Honor.

THE COURT:  Just, you know, it's kind of an obscure rule.  And, you know, the rules don't even have an index.  They have this table of contents and you've got to try and find all this stuff.  And, of course, it's not the only district, you know, you practice in.

MS. LENAHAN:  Thank you.

THE COURT:  So it's just kind of an oddball.  It's for the convenience and assistance of the Clerk's Office.

Okay.  I think I covered that.  Okay.  So then we're over to page 14.  Okay.  Let's go to Item Section 21, getting more information.

MS. LENAHAN:  Okay.

THE COURT:  All right.  This is totally grammatical. Let's see.  The phrase that is at the second line in Section 21 starts "Please see the stipulation."  And then I would say -- let's see here.  No, that's not where I want to start.

Okay.  Let me go up.  Where did I see this?

"For the precise terms and conditions of the settlement, please see the stipulation available at website."  Yeah.  The "by accessing" doesn't work.  I think you need to say "or access the court docket in this case," et cetera.

**MS. LENAHAN:**  Okay.

**THE COURT:**  Okay.  It just didn't quite hang together.  In other words, that sentence may have read at some time you can do it by doing X or by doing Y, but now it's a kind of directive.  See this or do this other thing, you know.

**MS. LENAHAN:**  Oh, I see.

**THE COURT:**  Yeah.  So it's like see this or access the docket.

All right.  And then this visiting, they -- they can't really go there and see what's going on at this point.  And we don't know when they'll be able to.  There's no one there.  The building is closed to the public at the moment.

**MS. LENAHAN:**  Oh.

**THE COURT:**  Gee, I don't even -- the drop box is inside, I guess.  Is there a way to get to it outside?

(The Court confers with court staff off record.)

**THE COURT:**  No.  I'm just checking.

The drop box is in the lobby.  If we tell them they can drop things off, then they're not going to be able to get in.  I guess maybe they let you in to go -- here's what I think they do, because there's guards are still at -- you know, these court security officers are still stationed at the entrance to the building.

Although they won't let people just go in and wander around and none of the courts are open, or only occasionally is

one open for a criminal case, and this may change as of January in very limited fashion, but they do, I gather, then let somebody come in to just go to the drop box in the lobby, stick their papers in, and then they're out again.

Okay.  But they couldn't go into the Clerk's Office and go up there and see papers and things because there's no one who's doing that for them.  So I think we should strike the part about "or by visiting."

**MS. LENAHAN:**  Okay.

**THE COURT:**  Change to "or visit."  But we're not going to tell them to do it, so we don't have to worry about that part.

**MS. LENAHAN:**  Okay.

**THE COURT:**  Okay.  So that's just one option they're not going to get to do.

Then on page -- let's see.  So, okay.  So I did that. Sorry.  I'm checking these things off as I go.

Then on page 19, just at the end where it says "dated" and "by order of the Clerk of Court" and "San Francisco, California," just take all that out.

I don't know, do we need a date?  I don't know.  You can put a date if you want.  Put a date, put whatever date you want to put on it, but take out "San Francisco, California," and "by order of the Clerk."

**MS. LENAHAN:**  Oh.  Okay.  Sure.

**THE COURT:** Okay. Then, let's see. Just a, I guess, editorial idea here, stylistic, you have several different footnotes; five, actually. Some are in smaller type and some are in the same size type as the body of the text.

So Footnotes 1, 2, and 5 that appear on pages 1, 2, and 17, respectively, are in the same size font as the text. Footnotes 3 and 4, that show up on page 15, are in the smaller type. I don't know which you prefer. I kind of like the smaller type setting it off. If you like the smaller type, then just change 1, 2, and 5 to smaller type as well.

**MS. LENAHAN:** Absolutely. That I can do.

**THE COURT:** All right. So 1 is on 1, 2 is on 2, and 5 is on 17.

**MS. LENAHAN:** Thank you.

**THE COURT:** Okay. All right. Now, you can put that aside.

Okay, the notice. All right. Now, as to the claim form, I've gone over it, and it's fine. Okay.

Proposed orders. Let me see if I can get that. Yeah. Proposed order. Let's see. I want to ask you a question. There are a variety of things that I may change or would change, but I can do these. To the extent something might be considered substantive, I want to go over it.

You have a phrase at line 11 and 12 on page 1 that says "And the settling parties having consented to the entry of this

order."  Now, the order will be changed somewhat.

Did you want to keep that, even though I change it, and consent to how I'm going to change it, essentially?

**MS. LENAHAN:**  From lead plaintiff's perspective, it's no problem to leave it in, and we can consent here, assuming the defendants are okay with it.

**THE COURT:**  Yeah.  Do you want to leave that in even though I'm going to make some changes?

**MR. CLOSE:**  Matthew Close, Your Honor.  I think that's fine unless I hear -- if I hear a change that I -- the change in my answer, I'll be sure to speak up.  I think it's fine to keep it.

**THE COURT:**  Okay.  Let's see.  Page 2.  Yeah, these are -- as I say, some of these things are just totally not worth talking to you about.  If they're bracketed phrases that I'm calling stage directions, you know, it doesn't say "exit stage left," but it says things like a date, this is -- that is at least, et cetera, et cetera, okay, those things will go out, and correct dates.

For all the places you have relative dates, and that's on a number of pages, I'll put specific dates in.

Let's see.  There a number of stage directions, like I said, we'll take care of.  I'm changing "class action clerk" to "Clerk of Court."

We'll fix up where they file their objections, the drop

box idea.  We don't have to tell them it's a drop box, it's just -- you know, but I want to make sure it's here in this building, not in San Jose or Oakland.  More stage directions.

Oh, yeah.  Well, for example, on page 7, lines 15 to 20 has to do with dates that I have changed.  And you're going along with them, and so we'll rewrite that.

And there was a question I had that I just wanted to take up with you that kind of caught my attention.  As we all know, there are people that wanted to intervene in this action.  I issued an order that went out yesterday denying the intervention for the reasons stated.  I don't know if you've seen that.

**MS. LENAHAN:**  We have, Your Honor.

**THE COURT:**  Yeah.  Fine.  Okay.

They have their own case pending before Judge Feinberg in San Mateo County.  And there is one phrase in the order that I just want to ask you about that comes up all the time in these orders, and I've never thought much about it, but here I just want to see what you think and what we should do, if anything.  It's paragraph 30.  It starts on page 8.  And it says:

"Pending final determination of whether the proposed settlement should be approved, neither lead plaintiff nor any class member directly or indirectly, representatively, or in any other capacity, shall commence or prosecute against any of the defendants any action or proceeding in any court or

tribunal asserting any of the release claims."

Now, there's some kind of a motion to dismiss that's pending, I believe, in the state court action. If that ends up being granted, would this, then, order preclude the losing party on that from appealing that order? I don't know if we should be telling them they can't do that.

I wasn't sure about whether we should leave "prosecute" in or not. "Commence," I can understand. Don't start any new cases while we're trying to figure out what's happening in this one. I was a little concerned about the "prosecute."

I don't know. I just want to be careful that I don't improperly interfere in that particular proceeding. I know they're aware of us, that the judge is there and is endeavoring not to do anything that essentially steps on our toes, but, you know, they have a case going forward at the moment.

MR. CLOSE: Your Honor, Matthew Close for Sonim.

I think Your Honor raises a good point. I don't think it's our intention to try, through this order, to waive any appellate rights or anything like that.

So we would have -- on behalf of Sonim, if Your Honor wanted to strike the "prosecute," I would have no objection to that.

THE COURT: Plaintiffs have any different view?

MS. LENAHAN: No, Your Honor. That's fine with us.

THE COURT: Any comment on behalf of the underwriters?

**MR. DOLAN:** No, Your Honor. That's fine with us as well.

**THE COURT:** All right. Thank you, Mr. Dolan.

All right. As I say, it's something that I ordinarily wouldn't even think twice about, but I just happened to know, you know, about the other, particularly in light of the motion.

Oh, I wanted to just point out before I forget -- I'm sort of running out of steam here. Let's see.

Right now the schedule I gave you, which I want to go back to and let Ms. Lenahan run those dates by me -- just have to get back to my page where I wrote all of them. Where did I write them? Just a second.

17, let me put that in front of me. I chose these dates, and I didn't mention this to you, I chose them with the idea that you could get to me the revised notices. You don't have to worry about the order. That I'll deal with myself.

The revised notices, in time for me to issue an order of preliminary approval by November 6th, which would mean you would have to get them to me either by the 4th, which would be a Wednesday, or maybe early, maybe by noon on the 5th. If you can't do that, then I want to move all these dates in relation to whatever date we do choose, and then they'll just move that many days off.

**MS. LENAHAN:** Your Honor, I do not think that would be a problem on our end, but, of course, we will have to -- you

know, we would want to show the defendants, you know, any changes we made just so they can vet them.  But I think that would be fine as long as they are okay with that.

THE COURT:  Okay.  And don't forget about that one thing about the notice, the follow-up, you know, with the emails, if necessary.

Okay.  Do you want to read the dates back to me -- oh, yes, Mr. Close.

MR. CLOSE:  I think it would be -- given the other event on Tuesday going on, I think maybe, if it's okay with plaintiff's counsel, we build in one more week just because there is some work to do and there's some -- you know, the next week may be a little choppy for some people and some of the staffs at the office.  So if it's all the same with plaintiff's counsel --

THE COURT:  Let me give you a heads-up on what that would do.  That would mean the 13th.  The 11th is Veterans Day.  Okay.  But the 13th.  And then I would just move all these dates, essentially, to run from the 13th.

The only problem is right now, if I move the notice to be published one week, that would go out on Christmas Day, which I don't think would be a good idea.  Right now we have it as the week before.

I don't remember when Hanukkah comes up this year, but sometimes it coincides and sometimes it doesn't.  But the

courts are going to be closed on Christmas.  And I don't know what those publications are doing, but they have a Christmas Day edition.

So I guess I could change that in some way, but I wouldn't want to make it too far forward.  It's just we get into the holidays as soon as we get that extra week.  You know, if you had to -- let's say maybe by noon on the Thursday, would that be enough maybe?

Are you going to be actively involved in the polls here, Mr. Close?

**MR. CLOSE:**  Your Honor, I've reconsidered.  Let's stick with the dates originally proposed.  The Court has thought more about it than I have.

**THE COURT:**  Well, not really.  All right.

So, Ms. Lenahan, try for the Wednesday, but you've got that little cushion into the first part of Thursday.

**MS. LENAHAN:**  Thank you.

**THE COURT:**  Yeah.  And try and find Mr. Close, if he's, you know, poll watching or whatever he's doing.

Okay.  Do you want to read the dates back, starting with the date for you to give your materials to -- I'm sorry, for Sonim to give their materials to you?

**MS. LENAHAN:**  Yes.  So that date I have is November 20th.

**THE COURT:**  Correct.

**MS. LENAHAN:**  The deadline for the claims administrator to mail the notice and proof of claim is December 4th.

**THE COURT:**  Correct.

**MS. LENAHAN:**  And that is the same date as the fee motion is due.

**THE COURT:**  Yes.  And it will be fees, expenses, and incentive award.  Correct.

**MS. LENAHAN:**  Okay.  The deadline for publishing the summary notice is December 18th.

**THE COURT:**  Correct.

**MS. LENAHAN:**  Deadline for submitting proofs of claim is February 3rd.

**THE COURT:**  Correct.

**MS. LENAHAN:**  And that is the same deadline as objections and exclusions.

**THE COURT:**  Correct.

**MS. LENAHAN:**  The motion for final approval is due February 17th.

**THE COURT:**  Yes.

**MS. LENAHAN:**  And that's the same date for the deadline of filing proof of mailing.

**THE COURT:**  That is correct.

**MS. LENAHAN:**  And the final approval hearing is March 5th.

THE COURT:  At 9:00 a.m.

MS. LENAHAN:  At 9:00 a.m.

The only date I'm unsure of would be the date for filing reply memoranda in response to any objections.

THE COURT:  Well, you won't need to because your motion now for final approval will postdate the objections, I think.  The objections are due February 3, and your motion would be two weeks later.

MS. LENAHAN:  I understand.  Okay.

THE COURT:  Okay.  That's one of the reasons I'm moving all those things around, so that everything -- you'll have everything that you need to counter by the time you file your motion for final approval.

MS. LENAHAN:  I understand.  Okay.

THE COURT:  Okay.  All right.

All right.  Now, let's see.  I do have a staff member here.  I'm just going to look over.  No.  Nothing needed there.

Ms. Clark, do you need anything on behalf of the Clerk's Office?

THE CLERK:  Sorry, Judge, I was on mute.

No, I think I have all the dates.

THE COURT:  Very good.  Thank you.  All right.

Counsel, then you have your work cut out for you. Nevertheless, I do want to say that I am, in case I haven't said it, granting the motion for preliminary approval.

And although I didn't discuss, by setting each one out, all of the factors, we did talk about a number.  And perhaps I should just say that, in this instance, clearly, from everything that's been discussed, there would be a risk and expense and complexity in seeing this case all the way through for all of the reasons.

And I do find that class counsel are all experienced.  I don't find there's any collusion between counsel.  I want to make clear, also, there's no reversion here.

And I can't, at this point, assess the reaction of the class, but we are going to find that out, and that won't come out until the final approval hearing.

But you've certainly made a sufficient preliminary showing at this time, and so the motion before me at this time is granted.

Does anyone have anything further that they need to add or have clarified?

Roll call.

Mr. Close?

**MR. CLOSE:**  No, Your Honor.

**THE COURT:**  Mr. Dolan?

**MR. DOLAN:**  No, Your Honor.

**THE COURT:**  Mr. Gonnello?

**MR. GONNELLO:**  No, Your Honor.

**THE COURT:**  Ms. Lenahan?

**MS. LENAHAN:**  No, Your Honor.

**THE COURT:**  And you're okay, Ms. Sullivan, with the record at this point?

She's nodding yes.

All right.  That'll conclude the proceeding.  Thank you very much for all the work you put into it.  Have a nice weekend.  Again, I'll wait for your next submission.

(Counsel thank the Court.)

**THE COURT:**  Thank you, all.  Bye-bye.

(At 10:54 a.m. the proceedings were adjourned.)

- - - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Friday, November 6, 2020

*Katherine Sullivan*

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter